# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS of RadioShack Corporation, et al., <br><br> Plaintiff, <br><br> -against- <br><br> SOOHYUNG KIM, JOSEPH C. MAGNACCA, STANDARD GENERAL L.P., GENERAL RETAIL HOLDINGS L.P., GENERAL RETAIL FUNDING LLC, STANDARD GENERAL MASTER FUND L.P., STANDARD GENERAL OC MASTER FUND L.P., P STANDARD GENERAL LTD., STANDARD GENERAL FOCUS FUND L.P., WELLS FARGO BANK, N.A., ROBERT E. ABERNATHY, FRANK J. BELATTI, JULIE A. DOBSON, DANIEL R. FEEHAN, H. EUGENE LOCKHARDT, JACK L. MESSMAN, and EDWINA D. WOODBURY, <br><br> Defendants. | Case No.: <br><br><br> **COMPLAINT** <br><br> Jury Trial Demanded |

Plaintiff, the Official Committee of Unsecured Creditors (the "<u>Committee</u>") of RadioShack Corporation (n/k/a RS Legacy Corporation, "<u>RadioShack</u>"), by its attorneys Quinn Emanuel Urquhart & Sullivan, LLP, brings this complaint against defendants Soohyung Kim, Joseph C. Magnacca, Standard General L.P. ("<u>Standard General</u>"), General Retail Holdings L.P. ("<u>GRH</u>"), General Retail Funding LLC ("<u>GRF</u>"), Standard General Master Fund L.P., Standard General OC Master Fund L.P., P Standard General Ltd., Standard General Focus Fund L.P., Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>"), Robert E. Abernathy, Frank J. Belatti, Julie A. Dobson, Daniel R. Feehan, H. Eugene Lockhardt, Jack L. Messman, and Edwina D. Woodbury. The Committee alleges as follows:

## NATURE OF THE CASE

1.     This case arises out of a scheme by which a New York hedge fund, Standard General, and its principal investment officer, Soohyung Kim, with the complicity of RadioShack's conflicted CEO and faithless board of directors, delayed actions that could have preserved significant value in the company in order to orchestrate a change of control transaction (the "October 2014 Transaction") designed to allow Standard General to acquire an insolvent RadioShack at the lowest possible cost.  A mere four months after the October 2014 Transaction, RadioShack met its inevitable fate of chapter 11 in the Delaware bankruptcy court.  The company's crash-landing into bankruptcy involved immediate closure of half of RadioShack's operations and handed over the company's most valuable assets to Standard General less than 60 days later.  This case examines how Kim and Standard General, the largest shareholder of RadioShack, came to control the senior-most debt of the company and how the fund even got RadioShack (through its CEO) to pay for Standard General's planned acquisition.  On behalf of the company and its creditors, who were left unpaid more than half-a-billion dollars, Plaintiff seeks compensation for losses incurred as the result of this scheme.

2.     Although RadioShack has been an iconic retail brand for decades, by 2013, the company's revenues and stock prices had been in steady decline.  Despite years of consistent and predictable losses, RadioShack's board attempted a turnaround in December 2013 by borrowing hundreds of millions of dollars in an ill-advised $585 million combined revolving and term credit commitment and a $250 million fixed term loan.  Overseen by Joseph C. Magnacca, RadioShack's CEO and a member of its board of directors, the procurement of these loans did not provide the company with anywhere near the operational flexibility it needed to accomplish a turnaround.  Instead, the loans imposed a crushing debt load and inflexible debt requirements

2

that all but sealed RadioShack's fate. In early 2014, within only a few months of the borrowing, RadioShack's crisis managers and restructuring professionals advised the Directors (as defined below) that RadioShack needed to consider selling itself or massively deleveraging through an in-court restructuring. At that point, the Directors had only one task at hand: maximize the immediate value of RadioShack, which could be accomplished by aggressively auctioning the company to the highest and best bidder. If the Directors had followed this mandatory course, losses would have been stemmed, the corporate enterprise would have benefited, and unsecured creditors would have had a recovery.

3.        Instead of taking this advice from its financial advisors, the Board initially did nothing for several months as RadioShack's condition continued to deteriorate. No competitive bidding process was held, and no potential buyers were affirmatively pursued. Then, in the Summer of 2014, the company began discussions with Kim and Standard General, its largest stockholder, about a change of control transaction. Considering RadioShack's condition at the time, the Standard General transaction under discussion made no sense; however, by that time, Standard General and its leader Kim had successfully coopted RadioShack CEO Joseph C. Magnacca. Standard General and Magnacca went to great lengths to undermine RadioShack's restructuring advisors and any other party suggesting the possibility of a RadioShack bankruptcy. Influenced by Standard General and the now conflicted Magnacca, the Board focused exclusively on the Standard General-led change of control transaction.

4.        The cornerstone of Standard General's scheme was acquiring control of RadioShack's senior debt based on the empty promise that bankruptcy could be avoided with a full-scale recapitalization of the company when in fact the transaction would only delay, and not prevent, an ultimate bankruptcy. Without the October 2014 Transaction, RadioShack's slow but

inevitable decline into bankruptcy threatened to wipe out Standard General's equity in the company. But by obtaining RadioShack's senior debt through the October 2014 Transaction, Standard General could capture the potential turnaround value for itself through a foreclosure in bankruptcy at a fire sale price. And if RadioShack miraculously refinanced all of its secured debt and avoided bankruptcy, Standard General would walk away with 50% to 80% of the company. Either case meant delaying a robust sale process or orderly liquidation of the company (as Radio Shack's unbiased advisors had persistently recommended) so that Standard General could buy the company as cheaply as possible and even get RadioShack (through Magnacca) to pay it for the effort through the substantial fees it charged in the October 2014 Transaction.

5.      Remarkably, the Board entrusted the Standard General negotiations to Magnacca. By that time, Magnacca recognized that RadioShack was likely a dead end and had aligned himself with Standard General for the promise of future opportunities with the firm and in direct conflict to the best interests of RadioShack. While asking Standard General about other retail opportunities, Magnacca pledged to be "anyplace" at "anytime" for the hedge fund. The fund rewarded him in July 2014 by choosing him for the board of directors of American Apparel, another struggling retailer controlled by Standard General. This appointment came in the very midst of Standard General's negotiations with RadioShack regarding the October 2014 Transaction—when Magnacca's sole focus should have been on addressing RadioShack's dire financial situation and not serving on the board of another distressed company. In complete derogation of their duties, the other Directors not only approved Magnacca's acceptance of this conflicting position, they also instructed Standard General to negotiate directly with Magnacca, making what should have been an arm's-length transaction into a bear hug.

6.      With a conflicted CEO leading the negotiations and the counterparty calling the shots, the company gave only token consideration to possible transactions that did not involve Standard General.  In the months leading up to the October 2014 Transaction, which the Directors recognized as a change of control transaction, no competing buyers were approached, no auction occurred, and discussions of an in-court restructuring of the company with existing creditors were put on the back-burner.

7.      All this despite the Directors having known that Standard General's recapitalization plan was doomed to fail from the start and would serve only to delay a bankruptcy filing for a few months.  Among other things, Standard General's proposal offered to provide only fleeting liquidity through a temporary and insufficient loosening of the borrowing base restrictions.  In 2014, RadioShack's liquidity crunch was caused by unrelenting store-level losses and was exacerbated by its senior-most lender imposing discretionary borrowing base reserves under the December 2013 loan transaction. Standard General proposed to acquire the senior loan facility and temporarily release these borrowing base reserves, thereby generating a limited amount of liquidity for the company.  However, the relief would only be until March 2015 (at the latest), at which point a ticking time bomb would explode—the reserves would be re-imposed and RadioShack would find itself in bankruptcy.

8.      Accordingly, the only way RadioShack could avoid bankruptcy before March 2015 was to achieve a complete turnaround of its business and refinance all of its secured debt.  Yet, everyone knew that the possibility of this happening was remote at best.  The fees and expenses associated with the October 2014 Transaction totaled more than $40 million, obliterating over 37 percent of the liquidity the transaction was supposed to provide.  Over $33 million of these fees went straight to Standard General or as Standard General directed.  And

because of these massive fees—which the Directors never questioned or analyzed—the entire transaction resulted in only $65 million more of short term liquidity, an amount nowhere near that needed to rescue RadioShack from collapse.

9.      Moreover, as everyone involved also knew, RadioShack's fate was inextricably tied to its need to close hundreds, if not thousands, of unprofitable stores that were bleeding cash. But the December 2013 term loans prohibited RadioShack from closing these stores, and the October 2014 Transaction did nothing to solve this central problem. The 2013 term lenders were not supportive of Standard General's scheme, had repeatedly refused to consent to store closures in the past, and provided no indication that they would suddenly change their minds. Failing to obtain the term lenders' consent *before* entering into the October 2014 Transaction embedded yet another ticking time bomb into the transaction.

10.     The prospect of refinancing the company's debt in early 2015 was hopeless for the additional reason that the October 2014 Transaction was a one-off transaction, done below par value, with non-traditional lenders, that would be impossible to repeat in the future. Given RadioShack's dire condition, conventional lenders wanted nothing to do with Standard General's proposed transaction even though they would have been secured by a first lien on RadioShack's most liquid assets. Standard General did not even want to acquire RadioShack's debt with its own money. Instead, Standard General cobbled together a group of hedge funds and enticed them to buy the debt with discounts (paid for by RadioShack) or guaranteed savings on credit default swaps to which these hedge funds were exposed on RadioShack's otherwise imminent default, or both. As a way to make money, various investment firms (including four of the seven found by Standard General) sold a form of insurance that RadioShack would stay in business until the end of 2014. They were thus motivated to keep RadioShack afloat (say, through a

6

transaction that made no sense for the company) so that they would not have to pay out on their insurance. Nonetheless, Standard General still had to arrange for them and others to buy RadioShack's senior-most debt at an enormous discount—$21 million below par. Then, masked as a "financing fee," Standard General made RadioShack cover the cost for this $21 million discount, so that RadioShack, not Standard General, paid for Standard General's cost of flipping the debt to the only people on Earth who would buy it. Consequently, it was pure fantasy that Radio Shack could have refinanced the October 2014 Transaction's mammoth loan (plus the $250 million in less secure term loans) as RadioShack would not have been able to afford the real cost of borrowing a second time.

11.     While Kim and Standard General masterminded the scheme, it could not be executed without the participation of a banking institution with the financial prowess to fund the various moving pieces and to act as the go-between connecting Standard General to the hedge funds. That role was willingly fulfilled by Wells Fargo. Despite repeatedly acknowledging that the October 2014 Transaction was doomed to fail, and that the hedge funds were willing to lend money only because of unique perks that would not factor into an ordinary lending analysis, Wells Fargo jumped on board to enable the transaction. In the process, Wells Fargo was the initial beneficiary of the huge discount on RadioShack's debt. And when Wells Fargo passed much of that discount along to the participating hedge funds, it kept a generous fee for its own riskless participation in the scheme.

12.     Because the success of the October 2014 Transaction was supported only by piling one highly speculative and ultimately unsustainable assumption on top of another, Kim, Standard General, Wells Fargo, Magnacca and the other Directors knew from the outset that the Transaction did nothing more than provide a bailing bucket to a sinking ship. Had Magnacca

and the Directors acted in good faith and in the best interests of the company, including by conducting a proper auction of the company or directing an orderly chapter 11 filing far earlier to stem its daily losses, RadioShack would have fetched far more value for its assets than it did four months later when it hit the bottom of the ocean. Accordingly, the Committee brings claims against Magnacca (both as an officer of the company and as a director) and the other Directors for breaches of the fiduciary duties of care and loyalty. In addition, the Committee asserts a claim against Kim, Standard General, and certain of its affiliates for breach of fiduciary duty as a controlling stockholder. The Committee also asserts claims against Kim, Standard General, the two shell companies that it created to facilitate the October 2014 Transaction, GRH and GRF, and Wells Fargo for aiding and abetting Magnacca's and the other Directors' breaches of fiduciary duty. The Committee further seeks to recover as money damages from Standard General, GRH, GRF, and Wells Fargo the fees that these defendants extracted from RadioShack as part of the October 2014 Transaction, through claims for unjust enrichment and restitution, and actual and constructive fraudulent transfers under federal and state law. Finally, to the extent Kim, Standard General, GRH, and GRF assert indemnification or exculpation obligations of RadioShack made as part of the October 2014 Transaction—and to the extent any of the defendants invoke release provisions incorporated into the October 2014 Transaction—the Committee seeks to avoid such obligations under the same principles.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 because it involves claims pursuant to federal law and state-law claims that are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy.

14.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims alleged in this Complaint occurred in Fort Worth, Texas, and RadioShack was based in this district.

## PROCEDURAL BACKGROUND

15.     On February 5, 2015, RadioShack and various of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Debtors operated their businesses and managed their properties as debtors in possession for less than 60 days following the bankruptcy, during which time they closed more than half their operations and sold substantially all of their remaining locations to affiliates of Standard General.

16.     The Committee was appointed on February 13, 2015.  The members of the Committee are AT&T Corp., GGP Limited Partnership, Martin Moad, National Distribution Warehouse, Inc., Simon Property Group, Inc., Tracfone Wireless, Inc., and Wilmington Trust, N.A., as trustee for the 6.75% senior unsecured bonds due May 15, 2019.

17.     As part of the Bankruptcy Court order authorizing the sale to affiliates of Standard General, the Committee was granted standing to bring this lawsuit.  The Committee's deadline to do so was established as September 1, 2015, and the Committee has timely commenced the action.

18.     On August 12, 2015, the Debtors filed a first amended Chapter 11 plan of liquidation (the "Plan") that, among other things, establishes a liquidating trust for the commencement of causes of action previously authorized to be brought by the Committee.  The confirmation hearing for the Plan has been scheduled for September 16, 2015.

## THE PARTIES

19.     Plaintiff is currently the Committee.  Upon the effectiveness of the Plan, the liquidating trustee appointed thereunder will become the Plaintiff and will continue prosecuting this action for the benefit of the trust.

20.     Defendant Soohyung Kim was a founding partner of Standard General, and is now the Managing Partner and Chief Investment Officer of Standard General.

21.     Defendant Standard General, upon information and belief, is an entity organized under the laws of Delaware, with its principal place of business in New York.

22.     Defendant GRF, upon information and belief, is a subsidiary of Standard General organized under the laws of Delaware, with its principal place of business in New York.  GRF is a party to certain of the agreements comprising the October 2014 Transaction and was a vehicle through which Standard General effectuated that transaction.

23.     Defendant GRH, upon information and belief, is a subsidiary of Standard General and a Cayman Islands exempted limited partnership, with its principal place of business in New York.  GRH is a party to certain of the agreements comprising the October 2014 Transaction and was a vehicle through which Standard General effectuated that transaction.

24.     Defendant Standard General Master Fund L.P., upon information and belief, is a Cayman Islands exempted limited partnership, with its principal place of business in New York.

25.     Defendant Standard General OC Master Fund L.P., upon information and belief, is a Cayman Islands exempted limited partnership, with its principal place of business in New York.

26.     Defendant P Standard General Ltd., upon information and belief, is a British Virgin Islands business company, with its principal place of business in New York.

10

27.     Defendant Standard General Focus Fund L.P., upon information and belief, is a Delaware limited partnership with its principal place of business in New York.  Standard General serves as the investment manager for each of Standard General Focus Fund L.P., Standard General Master Fund L.P., Standard General OC Master Fund L.P., and P Standard General Ltd. (collectively, the "<u>Funds</u>").

28.     Defendant Wells Fargo, upon information and belief, is a national bank that designates its main office as Sioux Falls, South Dakota.  Wells Fargo is the main operating subsidiary of Wells Fargo & Company, headquartered in San Francisco, California, which is one of the largest banking institutions in the world.

29.     Defendant Joseph C. Magnacca is the former Chief Executive Officer and a former member of the Board of Directors of RadioShack.

30.     Defendants Robert E. Abernathy, Frank J. Belatti, Julie A. Dobson, Daniel R. Feehan, H. Eugene Lockhardt, Jack L. Messman, and Edwina D. Woodbury (collectively, with Magnacca, the "<u>Directors</u>" or "<u>Board</u>") are former members of the Board of Directors of RadioShack.

## <u>FACTUAL BACKGROUND</u>

### I.     For Decades, RadioShack Was an Iconic Brand

31.     For almost a century, RadioShack has been a significant part of the American retail landscape, and its name is a well-established brand that is widely recognized by consumers around the world.  Based in Fort Worth, Texas, the company was engaged primarily in the retail sale of consumer electronics goods and services through the RadioShack store chain.  At the end of 2014, the company operated more than 4,100 stores under the RadioShack brand throughout the United States and certain territories, with each location carrying a broad assortment of third-party branded and private-label products.  The company also had a network of more than 1,100

11

RadioShack dealer-franchise outlets in the United States, Mexico and Asia, and sold products through its official website.

32. Before 2013, RadioShack's largest debt was in the form of bonds. On May 3, 2011, RadioShack sold $325 million aggregate principal amount of 6.75% senior unsecured notes due May 15, 2019. The obligation to pay principal and interest on these notes was jointly and severally guaranteed on a full and unconditional basis by all but one of RadioShack's wholly-owned domestic subsidiaries. As of the bankruptcy filing, there was approximately $330 million in aggregate principal and interest outstanding under these notes. RadioShack also owed trade debt incurred from its purchase of inventory from thousands of vendors. At the end of 2014, RadioShack owed approximately $124 million for merchandise and other unsecured obligations for goods and services. RadioShack was also party to numerous leases representing over $100 million in contingent liabilities.

## II. By April 2014, RadioShack Recognizes the Need to Sell Itself, Yet the Directors and Officers Fail to Take Action to Address the Company's Declining Financial Condition

33. Heading into 2014, RadioShack was already on the precipice of its collapse. Its revenues and stock price had been in steady decline, with the company having faced fundamental changes in the mobility business and increased competition in the consumer electronics industry, particularly from online retailers. The company reported losses in each of the 11 quarters leading up to the February 2015 bankruptcy filing and lost nearly one billion dollars since the fourth quarter of 2011. After incurring significant losses in 2012, RadioShack announced in early 2013 that it was bringing in a new Chief Executive Officer, Joseph Magnacca, who had previously been a senior executive at Walgreens and Duane Reade. With the company's nomination, Magnacca also joined RadioShack's Board of Directors.

34.     RadioShack soon thereafter retained AlixPartners LLP ("AlixPartners"), a consulting firm, to provide restructuring advice and Peter J. Solomon Company ("PJSC"), an investment bank, to assist in raising capital and strengthening the company's balance sheet.  On July 23, 2013, RadioShack announced that its Chief Financial Officer, Dorvin Lively, was being replaced on an interim basis by Holly Etlin, a managing director at AlixPartners.  A week later, on August 1, 2013, Standard & Poor's Ratings Services downgraded RadioShack's bonds to CCC—eight steps below investment grade—warning that the retailer might default in less than a year.

35.     Meanwhile, Magnacca was working on an operational turnaround strategy that he called the "five pillars" to the company's survival.  RadioShack would need money for that strategy and, rather than downsize the retail chain and focus only on profitable locations, the company hocked substantially all of its assets in December 2013 and incurred more debt than it could reasonably handle on a senior secured basis.  These loans did not include the terms needed to implement a successful turnaround strategy.  On December 10, 2013, RadioShack entered into a 5-year, $585 million asset-based credit agreement (the "Credit Agreement") with General Electric Capital Corporation ("GE Capital") as administrative and collateral agent, as well as CIT Group and RBS Citizens.  The Credit Agreement consisted of a $535 million maximum asset-based revolver and a $50 million term loan.  The Credit Agreement was scheduled to mature in December 2018.  In addition, borrowings under the Credit Agreement were secured by a lien on substantially all of the assets of RadioShack and its subsidiary guarantors (which were all but five of its domestic subsidiaries), as well as a first-priority lien on current assets and a second-priority lien on fixed assets, intellectual property, and equity interests of certain direct and indirect subsidiaries.

36.     On top of that, RadioShack took out a $250 million term loan (the "Term Loan")
from distressed investment funds managed by Salus Capital Partners ("Salus") and Cerberus
Capital Management ("Cerberus"), with Salus acting as administrative and collateral agent.  Like
the Credit Agreement, the Term Loan was due in December 2018.  Lenders under the Term Loan
had a second-priority lien on current assets and a first-priority lien on fixed assets, intellectual
property, and equity interests of certain of RadioShack's direct and indirect subsidiaries.

37.     These massive loans came at a severe cost to RadioShack and presaged the
company's collapse.  In particular, rather than give RadioShack operational flexibility, these
financing arrangements prohibited RadioShack from closing more than 200 stores in a year (or 5
percent of its stores, whichever was less).  In an environment in which RadioShack was
hemorrhaging cash from its scattered small-box retail footprint model, and closing stores would
have stemmed the company's operating losses, the company's inability to react to evolving
consumer market conditions took an already old-line company and gave it the maneuverability of
the Titanic.  Moreover, the financing arrangement allowed the lenders to impose onerous
borrowing base reserves on RadioShack at their discretion.  This right permitted the lenders to
require under certain circumstances that RadioShack set aside additional collateral to provide
them with comfort that the company could cover its obligations.  The impact of this was twofold.
First, it restricted RadioShack's ability to use the amounts it was required to earmark for the
lenders.  Second, RadioShack could not count the siloed assets toward its borrowing base, which
limited the company's access to its revolving loan commitments.  All of this only exacerbated
RadioShack's liquidity problem.

38.     Expectedly, the market's confidence in RadioShack continued to wane in early
2014, as evidenced by the company's steadily decreasing stock prices.  The company's bonds did

not fare better, falling to the low 60s by the end of January 2014. The equity and debt markets were correct in their skepticism of the company's prospects as RadioShack's 2013 fourth quarter and full-year results were abysmal. Comparable year-over-year sales dropped 8.8 percent and the company's revenues declined $400 million to $3.43 billion. Fourth quarter same-store-sales declined almost 20 percent, the same percentage drop seen in net sales ($935.4 million from $1.17 billion in the fourth quarter of 2012). The news just kept getting worse. RadioShack's 2013 fourth-quarter net loss ballooned to $191.4 million, up from $63.3 million in 2012. After the company announced these results on March 4, 2014, 5-year credit default swap transactions ("CDS") on RadioShack—derivative contracts that mimic insurance to make payments if RadioShack defaulted on its bonds during the 5-year term of the CDS—spiked, meaning that the cost to buy credit protection on RadioShack was expensive, reflecting the market's perception that RadioShack was prone to a default.

39. As a result, only months after having borrowed hundreds of millions of dollars on a senior secured basis, RadioShack was scrambling to revise its business plan. As early as the February 19, 2014 Board meeting, the Directors were advised that RadioShack's liquidity prospects were so dire that it needed to consider "strategic alternatives such as joint ventures, partnership, investments and/or a sale … to maximize value for [the company's] stakeholders." The Directors were further warned by PJSC that it was "unlikely" that the company could attain its "historical minimum liquidity target" and that a new, lower target might be achievable by closing a significant number of its stores.

40. In March 2014, RadioShack announced its decision to close approximately 1,100—or approximately one quarter—of its 4,300 stores nationwide. This closure plan was intended to generate cash, stem losses, and find a way to make the business profitable. The

company estimated that the closures would reduce working capital needs from $200-$250 million to $100-$150 million.  RadioShack hired A&G Realty to assist with closing stores, as the need to do so became even more pressing.  In particular, the company's 2014 second quarter results revealed a 13-week EBITDA of *negative* $86.2 million.  The company also reported net sales of $673.8 million, down 22 percent from the prior year, while comparable store sales fell by 20 percent, and ended the quarter with approximately $180 million in total liquidity.

41.     But, in order to close that many stores, RadioShack needed consent from the lenders who had just negotiated the loan agreements a few months before.  As the company's losses continued, its bonds plummeted to approximately 40 cents on the dollar.  Unable to reach an agreement with its lenders, on May 8, RadioShack announced in a filing with the Securities and Exchange Commission (the "SEC") that it would not be closing the 1,100 stores, as originally planned.

42.     No doubt (belatedly) recognizing the writing on the wall, Magnacca and the other Directors expanded the scope of PJSC's engagement at the end of April 2014.  No longer was PJSC tasked with simply helping the company to raise capital.  PJSC was now tasked with pursuing the course of action that PJSC itself had recommended only two months before—a "sale transaction" of RadioShack.  With the company now officially up for sale, Magnacca and the other Directors were charged with the fiduciary obligation to maximize the short-term value of the company, rather than merely prolonging the company's steady decline.  Moreover, they knew that obtaining temporary liquidity was not the solution.  With the company's liquidity already constrained by the discretionary borrowing base reserves, the company's only real chance to generate free cash flow was to implement its massive store closure program, which the lenders had already rejected with no indication that they would change their minds.  Yet, rather

than pursue a sale or in-court alternative at that time, the Directors inexplicably delayed the value-maximizing actions they needed to take in favor of a wait-and-see approach to locate additional sources of liquidity for the company, which they knew would only buy a limited amount of time at best.

## III.    Magnacca and RadioShack Play Favorites with Standard General

43.    Despite determining to explore a sale transaction, Magnacca and the other Directors downright abdicated their fiduciary responsibilities to maximize the short-term value of the company.   Rather than aggressively pursuing a sale or in-court restructuring of the company, as they were charged with doing and had themselves recognized that they needed to do, the Directors instead facilitated RadioShack's "assisted suicide,"[1] with Magnacca now asserting that the company would need *even more* capital if it were to complete its "five pillars" turnaround plan.   Indeed, following another dismal performance in the second quarter of 2014, Magnacca announced that the company was "actively exploring options," and was in "advanced discussions with a number of parties" over restructuring scenarios.

44.    While the Directors should have considered as broad a set of options as possible, there soon emerged only one scenario that the company seriously pursued—an illusory recapitalization plan spearheaded by Kim and Standard General, RadioShack's largest and most influential shareholder.   Standard General is an investment firm that prides itself on managing so-called "event driven" opportunity funds.   In that regard, it touts its ability to extract value from companies, like RadioShack, "that are undergoing dramatic change or are faced with material events," using "nimble" investment strategies that "offer [Standard General] the most

---

[1]    Scott Galloway, Prof. of Marketing, NYU Stern School of Business, as reported by Joshua Brustein, *Inside RadioShack's Slow-Motion Collapse*, *How Did the Electronics Retailer Go Broke? Gradually, Then All at Once*, Bloomberg Business, Feb. 2, 2015, available at: http://www.bloomberg.com/news/features/2015-02-02/inside-radioshack-s-slow-motion-collapse.

compelling risk/reward opportunities." Standard General's Managing Partner and Chief Investment Officer is Soohyung Kim, who markets his "17 years of experience investing in event-driven and leveraged company strategies."

45. In May 2014, around the time of RadioShack's annual shareholders meeting, Standard General informed management that it had acquired a large stake in the company. Standard General and Kim initially filed a Schedule 13G on May 9, 2014, which indicated that Standard General and Kim beneficially owned 9.8 percent of RadioShack's common stock. In order to be eligible to file a Schedule 13G, rather than a Schedule 13D, Standard General and Kim had to be passive investors that were holding their shares without the purpose or effect of changing or influencing the control of the issuer. On September 26, 2014, Standard General and Kim belatedly amended the Schedule 13G to a Schedule 13D, despite exerting control and influence over RadioShack commencing months earlier. At this time, they disclosed that in addition to owning 9.8 percent of RadioShack's common stock, they held options to buy three million more shares. Standard General also demanded a seat on RadioShack's Board of Directors as early as May 2014. While the company ostensibly refused to provide a board seat to Standard General, that refusal proved irrelevant as RadioShack, with the Directors' acquiescence, opened its doors to Standard General and granted the investment firm unprecedented access to the company and the ability to review and influence the company's business plans. Indeed, Standard General eventually dropped its demand for a board seat, having no continuing need for one once it received the Directors' assurance that it would be afforded "access" to the company and "standing to push things."

46. Given such a carte blanche, Standard General immediately made its presence known at the company and pushed it improvidently away from any form of in-court restructuring

or asset divestiture. Instead, Standard General imposed a change of control transaction that (a) paid Standard General to move the company's working capital facility to non-traditional lenders who would acquire GE Capital's loan at a discount and keep the company on the brink, (b) permitted Standard General, during that time, to complete full on-site due diligence without the interference of a competitive sale process, and (c) paved the way to Standard General's fire sale acquisition of RadioShack's choice assets. Standard General's goal was obvious. By obtaining control over RadioShack's loan obligations, and delaying bankruptcy long enough for it to do so, Standard General could extract value from the failing company at the expense of unsecured creditors. If RadioShack continued on its expected trajectory, Standard General would loan-to-own and capture the savings from store closings following bankruptcy, which it of course did four months later. But for so long as unsecured creditors bore the cost of continuing losses, Standard General opposed any potential reduction in the number of RadioShack stores, which were hemorrhaging cash, with Kim asserting that the company's "footprint" was its greatest asset that needed to be leveraged to obtain better terms from its mobile carriers. Standard General's staunch opposition to store closures was easy for it to advance when the company's losses were borne by its creditors, but when Standard General itself became a creditor it used its collateral position to pursue an even *smaller* RadioShack by acquiring only about 1750 of the company's most valuable stores along with the iconic brand itself.

47.     As the Summer of 2014 progressed, Standard General expanded its reach over the company by fortifying its already insider-relationship with Magnacca. Like long-time pals, Kim, Standard General's CIO, and Magnacca, RadioShack's CEO, communicated frequently by text message, deciding RadioShack's fate off of company lines. Seeking to align himself with Standard General, over the best interests of RadioShack, Magnacca would text Kim that, "I'm

there for you" and that "I'm all in with you. Let me know what you need. I'll be anyplace anytime." Even though the company was supposedly exploring a number of restructuring options with a variety of constituents, in reality, Magnacca was playing favorites by pledging his allegiance to Standard General.

48. And Magnacca was rewarded for his loyalty. Although Standard General was ostensibly a counterparty against whom Magnacca was negotiating for RadioShack's survival, Standard General appointed Magnacca to the board of directors of American Apparel, another struggling company in which Standard General had a substantial interest, where he was also selected to serve on American Apparel's compensation committee. For Magnacca, his appointment to the board of American Apparel was not only a "possible relationship build with [RadioShack's] largest shareholder," it was also his golden parachute, as he had already determined that "[it was] an important time for [him] to begin to establish [himself] beyond [RadioShack]." It was for that reason that Standard General had appointed him in the first place, with Kim counseling Magnacca that "frankly given what is happening at [RadioShack] having something else going on might be healthy."

49. Magnacca's appointment to the board of American Apparel, including its compensation committee, was laden with conflicts of interest given that his focus should have been on RadioShack and maximizing its short-term value. Moreover, he was the lead negotiator for RadioShack in the company's ongoing discussions with Standard General over a recapitalization plan and change of control transaction. Compounding the impropriety of all of this was that, at the same time as his appointment to American Apparel's board, Magnacca discussed with Kim other opportunities with even more Standard General-controlled retail companies. Magnacca's misconduct was also squarely at odds with RadioShack's Code of

Ethics, the preparation of which Magnacca had overseen as the company's CEO. The code cautioned all employees that they were "obligated to act solely in the best interests of [RadioShack] at all times" and that a conflict of interest "arises when you have a personal relationship or a financial or other interest that could interfere with your obligation to act solely in the best interests of RadioShack." Even though Magnacca had overseen the preparation of the Code of Ethics, he was talking out of both sides of his mouth. By serving simultaneous roles at RadioShack and Standard General's American Apparel, Magnacca was now, if not already before, negotiating a massive transaction for RadioShack against (or more accurately, at the whim of) his personal benefactor.

50.     It came as no surprise that RadioShack's advisors were shocked by Magnacca's appointment to the board of a Standard General-controlled company. Etlin's two-word reaction to the news summed it up best: "Holy crap." Durc Savini, head of PJSC's restructuring group, was similarly taken aback given that, as he saw it, RadioShack was "actively negotiating with [Standard General] over a transaction." Likewise, the financial media was incredulous, finding that Magnacca was a "curious" choice for American Apparel given what should have been his time-consuming obligations to RadioShack.

51.     The other Directors also had trouble coming to terms with the announcement, concerned about the "distraction" and difficult "optics" caused by "Soo Kim investments [in American Apparel] and [RadioShack]." Feehan in fact warned Magnacca that Kim was trying to use him to get a head start in RadioShack's deliberations over a turnaround strategy, cautioning him that "[Kim] could use your relationship on this board to gain leverage in negotiations with [the RadioShack] board." Feehan further warned Magnacca that the American Apparel appointment "[m]ay provide other [RadioShack] constituents with a view that you are personally

favoring [Kim's] potential plan for [RadioShack] over competing plans." Yet, in spite of these serious concerns, the Corporate Governance Committee of RadioShack's Board unanimously approved Magnacca's request to serve on American Apparel's board, with the remaining Directors acquiescing in the decision. The Directors' endorsement of Magnacca's American Apparel appointment and their turning a blind-eye to how that would impair his ability to negotiate a recapitalization plan with Standard General in good faith and with RadioShack's best interests at heart evidenced a complete abandonment on their part of their fiduciary obligations to the company in the months leading up to its bankruptcy. If the Directors' ratification of this obvious conflict of interest were not enough, they even advised Kim to work directly with Magnacca and declined to create a special Board committee to supervise these discussions.

## IV. Over the Summer of 2014, Magnacca and Standard General Work to Derail Any Turnaround Plan That Was Not Standard General's

52. Acting under Standard General's influence, the Directors' consideration of a sale transaction or in-court restructuring of the company was half-hearted at best. Despite having been tasked with a potential sale of the company for over two-and-half months, by the time of RadioShack's Board meeting on July 17, 2014, PJSC had spoken to only 10 possible purchasers, only a handful of which PJSC had itself contacted (the other potential purchasers reached out to RadioShack). Of these possible purchasers, PJSC then asked only a few to submit written indications of interest by June 30, 2014, with none of them taking PJSC up on that offer. Nor had PJSC identified "any other potential sources of capital for the Company other than existing debtholders." That this process was wholly inadequate is evidenced by the fact that, only a few months later—tellingly, after the October 2014 Transaction with Standard General had been completed—RadioShack retained another investment bank, Lazard Freres & Co. ("Lazard"), to conduct a new sale process. In a matter of weeks, Lazard had contacted approximately 75

potential purchasers.  At no time before Lazard was retained did the Directors instruct PJSC to expand its outreach or intensify its efforts to locate a potential buyer for RadioShack.

53.     This was so despite the Directors' continuing understanding that the prospects of RadioShack's survival were slim to none and that a future bankruptcy was becoming practically inevitable.  At the July 17, 2014 Board meeting, the Directors were advised that the lenders continued to implement discretionary reserves, "restricting the Company's access to the revolver."  They also learned that vendors were "requiring incremental [letters of credit] and contracting trade terms" that further tightened the company's liquidity.  Wireless carriers were also requiring standby letters of credit as a condition to continued business.  Moreover, at that point, RadioShack's 13-week liquidity forecast was "likely inadequate to absorb significant additional vendor, lender or carrier actions."

54.     As a result of these circumstances, RadioShack hired outside consultants to identify approximately 2,100 stores that could be closed in order to save the company, even though the Directors knew that, without a bankruptcy filing, this store closure program was highly speculative because it all depended on obtaining the lenders' consent to close more than 200 stores that year, which the lenders had refused to give just a few months earlier.  Indeed, management's business plan relating to these store closures did not even account for the fees and costs associated with obtaining this consent.  And surely recognizing that this store closure plan was unlikely to succeed, the Directors solicited advice from PJSC regarding potential strategic alternatives that were "likely" to result in a "change of control transaction."  The Directors were thus well aware by July 17, 2014, if not long before, that RadioShack needed to sell itself or file for bankruptcy and that they needed to act quickly to preserve as much immediate value as there was left in the company.

55.     Yet, in complete derogation of their fiduciary obligations, the Directors, at Magnacca's direction, instead aggressively pursued a Standard General-led recapitalization plan involving a change in ownership of the hundreds of millions of dollars of debt that the company had just incurred in December 2013, while giving passing consideration to a possible in-court restructuring or sale.  Indeed, following the July 17, 2014 Board meeting, the Directors received no further reports from PJSC regarding its supposed sale efforts nor any indication that PJSC even contacted anyone else.  And while the company continued some discussions with its existing bondholders and mobile carriers, these discussions were limited at best and, with Magnacca's conflicted allegiance to Standard General, certainly not on a level playing field.

56.     Standard General did its part to influence the company away from anything but a Standard General-led transaction.  To that end, Standard General forcefully attacked alternative plans, including those presented by AlixPartners concerning a potential bankruptcy of the company.  As Kim wrote to Directors Lockhart, Feehan, and Magnacca on July 15, 2014: "[Bankruptcy] is a dead-end road.  What it does is it gives the creditors the power to approve a reorganization plan, the equity holders and the board will no longer be in control."  More importantly from Kim's perspective, Standard General would lose its control and influence over RadioShack if a bankruptcy filing occurred before Standard General acquired any of RadioShack's senior debt.  In a theme that would be repeated over the coming months, Kim disingenuously asserted in a July 16, 2014 email to certain of the Directors that bankruptcy would only result in RadioShack's total liquidation.  He also claimed that the advisors did not know anything about bankruptcy, despite their having been retained for that purpose, and that they were pushing for bankruptcy "to enhance their interest."  Kim also sought to have PJSC

terminated for discussing a potential bankruptcy with creditors. Kim did all this while supposedly a "passive" stockholder.

57.     Opposing any form of in-court restructuring alternative, Standard General proposed that instead it be given control of RadioShack's senior secured debt. In August 2014, working alongside Hilco Global ("Hilco"), a financial services company, Standard General proposed to purchase a participation in the Credit Agreement that would provide temporary liquidity by allowing Standard General to free up the discretionary borrowing base reserves that were hamstringing the company. The end game was to provide this participation through January 2015, at which time Standard General and Hilco "would backstop a rights offering through the conversion of their loan participation."

58.     Any such short-term liquidity accomplished by this plan would have been at most a band-aid to RadioShack's irreversible decline, and thus would have served only to insert Standard General into RadioShack's lender group as a means to obtain control of the whole company. As the Directors were advised, the Standard General/Hilco turnaround plan did nothing to the Term Loan and was still premised on a business plan in which more than 200 stores were closed. As a result, even if Standard General acquired a participation in the Credit Agreement, its plan was based yet again on the (now) absurd notion that the Term Loan lenders would simply consent to the store closure program. As the Directors were further advised, the Standard General/Hilco proposal did not result in any actual deleveraging, and RadioShack's suppliers were therefore unlikely to restore credit terms or release their recently-acquired letters of credit, all of which were still constraining the company's liquidity.

59.     Nonetheless, evidencing Standard General's influence over the company, RadioShack's management and advisors worked—at the direction of Magnacca, the Board, and

Standard General itself—to assess whether Standard General's proposal was viable. Over the course of the Summer, AlixPartners ran 27 distinct models of the company's forecasted financials for 2015 and 2016 which incorporated Standard General's proposal and performed these different scenarios "whether or not these changes are realistic or unrealistic," with the intention of adjusting them later if necessary. The fundamental assumptions in these financial forecasts were developed by Magnacca, working with and at the bidding of Standard General. Unsurprisingly, the forecasts were unbelievable. On August 26, 2014, Holly Etlin, the experienced professional who was previously RadioShack's interim CFO and who would again serve in that capacity a month later, concluded that the business plans based on Standard General's and Magnacca's assumptions were rife with "logic gaps in several of the key business transitions."

60. By the end of that Summer, Feehan's concern that Magnacca was "personally favoring" Standard General over RadioShack's other constituents also proved prescient. During the August 28, 2014 Board meeting, Standard General's recapitalization proposal was at the forefront, even though all involved recognized that it would adversely affect unsecured creditors. In particular, the Directors were warned that Standard General's proposal would negatively impact other creditors, with bond values likely being driven down and creditors facing the risk of dilution and further subordination.

61. In preparation for that meeting, the Directors also received a liquidation analysis showing that RadioShack was unquestionably insolvent. The Directors were also advised that "[l]iquidity continues to be pressured from operating burn, vendor tightening and ABL lender discretionary reserves," with "revolver availability … projected to be effectively depleted by the

end of September [2014]." In fact, the company was burning cash at an astronomical rate, with year-to-date EBITDA totaling negative $168 million.

62.     Management also changed its business plan to fall in line with Standard General's plan of favoring a larger retail footprint. Although RadioShack had proposed earlier in the year to close approximately 1,100 stores, by the July 17, 2014 Board meeting, the company recognized the need to close almost 2,100 stores. Nonetheless, facing pressure from Standard General, management eventually retreated from that view and instead settled on a "more modest store closure assumption." Notably, even though RadioShack was in a liquidity crunch, Standard General's proposal to close only 300 stores would have worsened it because closing that few stores carried a higher pro forma EBITDA loss "due to [there being] more unprofitable stores."

63.     As before, the materials circulated before the Board meeting evidenced Magnacca's and the Directors' understanding that they had a fiduciary obligation to "maximize value for all stakeholders." But, the Directors were still woefully off the mark in how they were supposed to go about doing that. While having instructed PJSC after the July 17, 2014 Board meeting to pursue a "parallel path process" of one, exploring a recapitalization plan, and two, negotiating with existing debt holders over, among other things, a bankruptcy, the Directors knowingly provided PJSC with incomplete instructions: the Directors were pursuing a change of control transaction with Standard General, but did not instruct PJSC to pursue a sale or other change of control transaction with any other parties to ensure a competitive process. Not surprisingly, PJSC did not pursue such transactions.

64.     Moreover, while the Directors had instructed PJSC to have discussions with RadioShack's other constituents, Magnacca led the company to pull strings for Standard General. None of those parties had the same inside track to the company that Standard General did, which

for its part was lobbying Magnacca to fire PJSC for even talking to the bondholders. Standard General had installed itself at RadioShack months earlier in June ostensibly for onsite diligence (again, as a "passive investor") but in reality so that it could have continuous access to the Board and management, regularly communicating directly with Magnacca, Feehan, and others. Discussions with other parties, specifically the bondholders, proceeded on a totally different track. Management was slow in sharing information with bondholders, even though they expressed willingness to equitize their holdings and put up additional funding if a viable business plan could be developed. While these discussions with the bondholders nominally continued until the end of September, the bondholders were never afforded the same level of access to management and the Board that Standard General had.

65.     As a result of its favored status, Standard General was invited to the August 28, 2014 Board meeting to make a presentation in support of its recapitalization proposal. Tellingly, no other outside debt or equity holder was invited. Arguing against the empty chair at the restructuring table, Kim claimed that the bondholder plan was simply not "feasible because GSO and other leading bondholders were indifferent to whether the Company reorganized or was liquidated given their credit default swap positions and the Company's recent financial performance." Claiming once again that bankruptcy inherently meant liquidation, Kim also claimed that "recoveries to unsecured bondholders, landlords, and other unsecured creditors in a liquidation would be minimal." And while the Directors needed no reminder, they were once again told that any recapitalization plan—presumably other than working with Standard General—would be inextricably linked to store closures, something they knew could not be achieved without a bankruptcy filing.

66.     As discussions over the Standard General/Hilco plan progressed, Standard General and Magnacca, who was now its inside-man at RadioShack, began sharing a common goal to ostracize RadioShack's advisors, "[c]lear house" of them, or covertly "work[] around them," largely because they were "non believers" who were exploring turnaround opportunities that were not to Standard General's benefit.  On August 6, 2014, Kim wrote to Magnacca that "Holly [Etlin, of AlixPartners] is a snake, you told me that you recognized that early and we already know her … She should already be gone."  Magnacca responded:  "I know.  I think we have to take her out."  Kim's attacks on AlixPartners continued.  According to him, "[it was] time to call people out.  No time for horseh1t."  Like a yes-man, Magnacca agreed:  "Yep.  We have a few we need to take out."  Not content to disparage the advisors to just Magnacca, on August 7, 2014, Kim wrote to Feehan that Standard General had "receive[d] so much resistance from [PJSC and AlixPartners] (who seem determined to push down one path) that we are just working around them at this point and would prefer if they not know what [sic] where we are going."

67.     Falling in line with Kim, Magnacca continued to work directly with Standard General to push through a Standard General-led recapitalization plan while at the same time side-lining any advisors who were not doing Standard General's bidding.  On September 1, 2014, Magnacca wrote to RadioShack management that the company needed to mechanistically employ its advisors while at the same time keeping them out of the thought process:  "We also have to use our advisors as arms and legs and not share information that they can use against us or our goals."  Seeking to steer management away from any consideration of bankruptcy, Magnacca portrayed AlixPartners and PJSC as wrongly fixated on liquidating the company:  "I share standards general and Hilco's view that closing fewer [stores] is better and I don't believe

in the work that [supports closing] more, as it's solely based on liquidation math."  As a result, Magnacca allowed Standard General to install its own people "on the ground … to keep [PJSC and AlixPartners] honest."

68.     After infiltrating the company, Standard General interfered with RadioShack's already minimal discussions with the bondholders and other possible restructuring parties.  In September 2014, upon learning that RadioShack and the bondholders had entered into a confidentiality agreement governing their discussions that precluded Standard General from getting its hands on a bondholder-prepared business plan model, Kim was livid.  Complaining that this was "troubling on a number of levels," Kim asserted that there should not have been a "competition of resources" between Standard General and the bondholders because presumably Standard General should have had all of the company's attention.  Seeking to obstruct any continuing discussions with the bondholders during this critical time, Kim further claimed that the lead bondholder group did not have "enough bonds to be a potential plan sponsor."  That same month, Kim took issue with GE Capital for its lack of sycophantic enthusiasm for a Standard General-led recapitalization, alleging that it "would reek of bad faith, in their actions [to even consider bankruptcy as an option] as well as anyone who is promulgating this effort." Of course, bankruptcy would have wiped out Standard General's common stock in RadioShack but is exactly what Standard General sought after it acquired control of RadioShack's secured debt.

69.     Even the company's CFO recognized that Magnacca was no longer putting the company first.  John Feray, who served as CFO between Etlin's two stints as interim CFO, abruptly resigned in the middle of September 2014.  Feray had grown concerned about the lack of cooperation between Magnacca and the rest of the management team, and, in particular,

Magnacca's refusal to consider Feray's input on financial matters (while favoring Standard General's). Etlin stepped in again as the company's interim CFO but, like Feray before her, Magnacca deliberately withheld information from her and excluded her from the company's consideration of key decisions. And he did so with the encouragement of Standard General, which wanted to keep AlixPartners, and any other advisor that even uttered the possibility of pursuing alternatives to a Standard General-led transaction, out of the loop.

## V. At Standard General's and Magnacca's Behest, RadioShack Moves Forward with Standard General's Ill-Conceived Recapitalization Plan

70.     Days before the August 28, 2014 Board meeting, GE Capital declined to sell a participation interest in the Credit Agreement to Standard General and Hilco. As a participation in the Credit Agreement was the foundation of Standard General's original recapitalization proposal, Standard General was forced back to the drawing board. Still motivated by a desire to seize control of RadioShack through its secured debt, Standard General worked with Magnacca in September 2014 to devise a new recapitalization plan for RadioShack that made even less sense than the one before. Although Hilco had also participated in these discussions at the outset, it eventually removed itself from the process, leaving Standard General as the plan's only sponsor.

71.     Under this new recapitalization plan, which became the October 2014 Transaction, Standard General became the pied piper of distressed debt funds to purchase the Credit Agreement outright from GE Capital, so that Standard General, and not GE Capital, could call the shots. Along with acquiring the loans issued under the existing Credit Agreement (which included a $535 million asset-based revolver and a $50 million asset-based term loan), Standard General proposed to amend the agreement to convert the outstanding revolving commitments into a new first-out term loan with an aggregate principal amount of up to $275 million. What

remained of the asset-based revolver would be subdivided into a letter of credit facility in an aggregate principal amount of up to $120 million and new revolving loans in an aggregate principal amount of up to $140 million. These debts ($275 million + $120 million + $140 million) would thus comprise the entirety of the original $535 million asset-based revolver component of the Credit Agreement, with the $50 million asset-based term loan remaining intact. Standard General and the new hedge fund lenders promised to forbear from imposing discretionary borrowing base reserves, *but only until* March 15, 2015 (or upon the occurrence of any number of events of default). This was purportedly to allow RadioShack to purchase inventory for the 2014 holiday season, but in reality that never happened.

72.     Standard General was not pursuing this path to make a "rescue" loan to RadioShack. Rather, a critical component of Standard General's plan was a so-called "Recapitalization and Investment Agreement," pursuant to which Standard General, as the backstop for the $120 million letter of credit facility, would be entitled to convert its funded obligations into a majority interest in RadioShack of between 50 and 80 percent of the company's stock. In addition, the Recapitalization and Investment Agreement required RadioShack to establish a six-person "Transaction Committee," consisting of three members designated by GRH, RadioShack's CEO (Magnacca), RadioShack's CFO, and one other representative appointed by RadioShack, which was entrusted with overseeing and coordinating discussions regarding the recapitalization transactions and the implementation of an interim operating plan for RadioShack.

73.     Instead of discretionary reserves, built into the amended Credit Agreement for the first time would be additional events of default that would occur if certain steps to realize Standard General's change in control were not completed by March 16, 2015. These steps

included reconstituting the board to consist of the company's CEO, two independent directors selected by the company and four individuals nominated by Standard General (thus giving Standard General majority control of the board); amending or replacing RadioShack's contract with Sprint, one of the company's major wireless suppliers; the completion of the contemplated rights offering for new shares in RadioShack; and the company having a minimum liquidity of $100 million in January 2015.

74.    The problems with Standard General's plan were legion from the outset. Standard General's financial machinations afforded RadioShack with illusory additional liquidity, which, in all events, would be available only until March 15, 2015, at the latest, when the new term lenders could re-impose the discretionary borrowing base reserves, and more likely only through January because RadioShack was never going to be able to achieve a miraculous reversal of its downward liquidity spiral in the few months before that deadline.  Further, as much as 37 percent of the new liquidity would be wiped out the very first day from the over $40 million in fees that would be paid for structuring and participating in the transaction.  And the proposed equity conversion was based on a pipe dream set of conditions that could never be achieved and, undoubtedly, more "logic gaps."

**A.    The October 2014 Transaction Was Based On a Reverse-Engineered Business Plan That Could Never Be Realized**

75.    Exploiting its inside track to the company, Standard General influenced management to retrofit the company's business plans to Standard General's supposed turnaround strategy.  As the Directors learned at the October 2, 2014 Board meeting, which led to the approval of the October 2014 Transaction, "management revised its own five-year business and recommended the revised plan be adopted by [Standard General]."  This revamped business plan included numerous lofty and unjustified assumptions and projected 2016 EBITDA of $94

33

million, even though, at that point, RadioShack was losing $1 million *a day* (a massive turnaround by any measure).

76.     Most glaringly, management's business plan, which was spearheaded by Magnacca, required RadioShack to close 1,100 stores.  Not only was this reduction in RadioShack's store closure program (from 1,700 to 1,100) toeing the mark of Standard General's insistence that RadioShack maintain as large a retail footprint as possible (even though Standard General would later buy only the most choice stores to run a smaller, profitable RadioShack), it was also still predicated on the misguided notion that the company's Term Loan lenders would consent to these store closures despite having consistently refused to do so in the past.  There was no basis whatsoever for believing the Term Loan lenders would reverse their long-held position, and the business plan's key assumption of store closures did not even bother to account for the cost of obtaining any such consent.

77.     The absence of the Term Loan lenders' consent to store closures was a glaring and severe shortcoming to the business plan, a risk of which Standard General and the Directors were plainly aware yet chose to ignore.  For example, PJSC expressly advised the Board that "leaving [Salus] in place constrains ability to close unprofitable stores."  Director Feehan also recognized that the Term Loan lenders were an "obvious problem" to management's revamped business plan.  Writing on September 17, 2014, Feehan admitted that a "key component of deliberation will be around the risk of Salus withholding any required consents" and that, while "[t]aking Salus out" would avoid this risk, it was unlikely to happen.  Indeed, in late September 2014, the company even delayed considering Standard General's transaction for weeks in the hopes that Salus might join Standard General and solve this key component.  Salus's sudden

withdrawal from those discussions only further confirmed that the belief that the company could obtain the Term Loan lenders' consent to close stores was delusional.

### B.     The October 2014 Transaction Provided Only Short-Term Liquidity

78.     Because Standard General's plan allowed the working capital lenders to re-impose the former discretionary borrowing base reserves by no later than March 15, 2015, Standard General and the Directors knew that this plan was predicated on the lofty assumption that, only months after implementing a Standard General-led loan purchase, RadioShack would be able to refinance all of its secured debt.  The imposition of the discretionary reserves against the company's borrowing base was what caused the company's liquidity crisis throughout 2014 in the first place.  Without being able to tap the assets and cash that would have to be reserved all over again starting on March 15, 2015, RadioShack would find itself in the same liquidity crunch that it suffered before Standard General's proposed plan went into effect.  As a result, under the plan, RadioShack would have to find even more liquidity before March 15.  Yet, there were absolutely no discussions among the Directors about whether RadioShack would be able to refinance before then, and, indeed, Magnacca "didn't concern himself with issues around the financing."

79.     Standard General, Magnacca, and the other Directors knew that RadioShack would have to refinance Standard General's own band-aid loan immediately after receiving it.  On September 4, 2014, as Magnacca and Kim were working on how to push through Standard General's proposed recapitalization, Kim admitted the fallacy of his transaction.  He wrote to Magnacca, "FULL REVERSE THRUSTERS … Right now, even if we step into [GE Capital] and release all of the reserves, company still burns through all of that liquidity."  Then, in advising the Board about the risks of Standard General's plan, PJSC warned that the plan

"effectively requires refinancing both the [Salus-led Term Loan] as well as the new [amended Credit Agreement], given the latter's ability to re-impose discretionary reserves after March 15th, even if the rights offering is consummated."

80.     Magnacca and the Directors knew that such a refinancing was virtually impossible.  As an initial matter, to obtain the October 2014 Transaction in the first place, RadioShack had to agree to a change-in-control transaction that handed the company over to Standard General.  Such a transaction was not replicable.  Moreover, RadioShack's long-term prospects for liquidity were not enhanced by Standard General's transaction, which did nothing to deleverage the company.  Instead, the company's liquidity was still tied to its borrowing base reserve requirements, which would be reinstituted in a matter of months, and dependent on a business plan in which the company would close hundreds, if not thousands, of its stores, even though lenders' consent for such closings was nowhere near forthcoming.

81.     Standard General was uniquely aware of other reasons that made a further refinancing of the company's debt unachievable.  In particular, Standard General knew that a purchase of the loans under the Credit Agreement in October 2014 was possible only because it had covertly secured a steep discount for itself and its group of hedge funds in purchasing the commitments, which depleted the company of further liquidity and could never be afforded in a future round of refinancing.  Without such a discount, Standard General and the new lenders would never have agreed to purchase GE Capital's interest in the Credit Agreement.

82.     This discount engineered by Standard General enabled its creatively assembled group of hedge funds to purchase $325 million of RadioShack's most secure debt for only $304 million.  Specifically, Standard General arranged a complex scheme whereby it would (a) purchase from GE Capital the outstanding amounts due under the senior-secured revolver and

term loan (totaling approximately $142 million), and (b) fund the remainder of the $325 in commitments by paying just $162 million directly to RadioShack. These payments totaled only $304 million, even though RadioShack would immediately owe the full $325 million as a result of the transaction. The $21 million gap was a discount; a direct loss to RadioShack that would, in turn, jack up the return earned by holder of the debt, particularly if that debt had to be repaid just a few months later because of a default.

83.     Standard General did not, however, fund its purchase of the $325 million in debt itself. Instead, Standard General had Wells Fargo pay the amounts to GE Capital and RadioShack on its behalf, thereby nominally "purchasing" this portion of the overall $585 financing package from Standard General. But Wells Fargo was not funding the purchase either. Wells Fargo, in turn, flipped the $325 million in loans to Standard General's hand-picked group of hedge funds, passing along most of the discount that Standard General had obtained (with the exception of a handsome fee to Wells Fargo for its agreement to act as a shill for Standard General).

84.     At the end of the day, Standard General and the hedge funds—through Wells Fargo—paid approximately $304 million to acquire $325 million in obligations owed by RadioShack. This difference of over $21 million amounted to a manufactured discount for Standard General and the hedge funds even though the debt was secured by a first lien on the company's most liquid assets. And, the discount was paid by RadioShack to its detriment and the detriment of its creditors; only RadioShack—not Standard General—was out-of-pocket for the discount. This critical feature of the financing obfuscated the company's "true cost" of borrowing, which the company could not afford again in the future. Because this financial maneuvering was a one-off opportunity that made the recapitalization plan possible in the first

place and could not be replicated in the future, Standard General knew that, without such a future discount, a further refinancing was all but hopeless. The Directors did not even attempt to appreciate any of this and instead approved the fatal transaction in the course of a conference call.

85.     Indeed, even Wells Fargo, which jumped in only weeks before the October 2014 Transaction to assist Standard General to orchestrate the complex acquisition, openly acknowledged that the transaction would not enable the company to survive more than a couple of months. On October 2, 2014, for example, Wells Fargo analyst David Eller mockingly sent a Bloomberg message to another analyst asking, "would it be risky for me to buy you a gift card from RSH NOW for your Christmas present evans? or should I wait?" Long time Wells Fargo managing director Grant Jordan jumped in with a spot-on response, "I think you are good, but you will definitely need to use it before 3/15." The following day, when asked by a reporter what he thought of the RadioShack transaction, Jordan responded, "Gets them through Christmas."

### C.     The October 2014 Transaction Provided Only a Remote Chance of Achieving a Debt-For-Equity Conversion

86.     An essential component of Standard General's plan was the amendment of the Credit Agreement to allow it to convert funded obligations of $120 million into shares of a new series of RadioShack preferred stock under the "Recapitalization and Investment Agreement." Like obtaining the Term Loan lenders' consent to close stores, the conversion to equity aspect of Standard General's plan was similarly based on naïve and unattainable conditions. In particular, to require the conversion to equity, RadioShack had to have $100 million in liquidity on January 15, 2015. The company also had to successfully renegotiate its contract with Sprint, one of its

major wireless suppliers.  The Directors were well aware of these conditions having been advised of them by PJSC at the October 2, 2014 Board meeting.

87.     Standard General and the Directors were also well aware that RadioShack would never achieve these conditions and that the conversion and rights offering would never occur. As to the liquidity requirement, the company was already losing $1 million in cash each day and almost 37 percent of the immediate liquidity it was to receive under Standard General's plan was going to be erased the very first day to pay for the fees and costs associated with making that short-term liquidity available at all.  Moreover, obtaining additional liquidity after that point, until January 15, 2015, was premised entirely on RadioShack's ability to close unprofitable stores to staunch the company's cash bleed.  But, again, everyone involved knew that was never going to happen because the Term Loan lenders would not provide the consent to allow the company to close more than 200 stores that year.  Indeed, PJSC had warned Magnacca and the other Directors that "[t]rade/vendors [were] likely not [to] restore credit terms/release [letters of credit] until turnaround materializes and deleveraging occurs."  Lastly, even RadioShack's mobility carriers did not think that the company would ever make it to a conversion and rights offering.

88.     These risks were quickly realized.  Within weeks of the transaction, RadioShack's liquidity continued to evaporate, with the company still operating unprofitable stores that it could not close due to the absence of the Term Loan lenders' consent.  On October 21, 2014, a reporter from the Wall Street Journal indicated to the company that he was writing a story and learned that the response to the new financing package had been critical, finding that "it's just a short term band aid and that a broader, more substantive initiative should have been undertaken." Upon learning of the reporter's investigation, Etlin responded that it was "[r]emarkably

accurate." Later, after reading a story in Debtwire, which noted that "[t]he requirements [for the conversion] are considered a pipe dream by some analysts, given RadioShack's cash burn," Magnacca complained to his team that it was "[p]retty disturbing that they have access to [many of the same] exact references in such a timely manner."

89.     Reaction from RadioShack's suppliers was unsurprisingly terrible.  Many of them recognized RadioShack's increased short-term liquidity for what it was (as a temporary delay to the company's certain bankruptcy), and they did not provide the company with better terms out of concern that RadioShack would not survive long enough for the conversion and rights offering.  In fact, all three of RadioShack's major wireless carriers reacted negatively to the October 2014 Transaction, refusing to provide RadioShack its allocation of the new iPhones that the company had anticipated receiving and that it needed to avoid another abysmal holiday season (like the prior year's had been).  Given the unsustainable assumptions underlying Magnacca's and Standard General's business plan for RadioShack, these events came as no surprise to Standard General, Magnacca, and the other Directors.

**D.     The October 2014 Transaction Targeted Lenders Who Would Be Motivated by Delaying Bankruptcy**

90.     Further informing Standard General, Magnacca, and the other Directors that a re-sale of an amended Credit Agreement was make-believe was the fact that the only firms that Standard General could find to complete its syndicate came from a dangerously unconventional source, specifically hedge funds that were financially motivated to keep RadioShack afloat for only a few months.  GE Capital, RadioShack's original lender under the Credit Agreement, had been so concerned about RadioShack's chances and thus its own prospects of being repaid that it had imposed the discretionary borrowing base reserves that crushed RadioShack's liquidity profile in the past year.  At one time, another financial institution, UBS AG ("<u>UBS</u>"), had

explored providing a financing commitment but its commitment expired with UBS unable to "cobble together" a syndicate.

91.      At the outset, Standard General could not convince traditional lenders to participate in its syndicate, even though they would have been secured by a first lien on RadioShack's most liquid assets.  As a result, Standard General turned to hedge funds (the "Participating Lenders"), more than half of which had open CDS positions on RadioShack.  The Participating Lenders that had sold CDS protection on RadioShack bonds bet that the company would not default on its bonds—at least not before December 20, 2014.  If the company did default before that date, then these Participating Lenders would have suffered massive losses. The October 2014 Transaction, however, enabled these Participating Lenders to avoid such losses and keep RadioShack out of bankruptcy until after December 20, 2014.  This way, the Participating Lenders that had previously sold CDS on RadioShack bonds could pocket the upfront payments received from the purchasers of that protection and actually prevent their own losses by delaying RadioShack's default into 2015.

92.      And, as Standard General was uniquely aware, even aside from the CDS positions on which many of the Participating Lenders sought to capitalize, they were all incentivized to join Standard General's syndicate by Standard General's having first secured a $21 million discount below the par value of the acquired debt, even though that debt was as secure as RadioShack could ever offer.  That discount enabled the Participating Lenders to obtain an exorbitant yearly return on investment of not less than 20 percent.  Only with this perk did the Participating Lenders' involvement in the transaction make business sense to them, which confirmed to Standard General that any refinancing of RadioShack's debt on affordable terms was impossible.

41

### E.    The October 2014 Transaction Involved Excessive Fees

93.    By any reasonable measure, Standard General's proposed recapitalization did not provide RadioShack with anywhere near the amount of liquidity it needed to continue as a going concern, and much of the liquidity produced by the transaction would be consumed the very first day by the fees and costs associated with the plan.  Under the terms of the loan, the company was required to pay back tens of millions of dollars right away.  As a result, as the Directors were advised at the October 2, 2014 Board meeting, Standard General's recapitalization plan actually provided only $108 million of immediate liquidity to RadioShack.  Yet, the expenses associated with the transaction amounted to approximately $40 million, wiping out 37 percent of that amount.

94.    Of the excessive fees and costs that RadioShack had to pay for a few months of borrowed time, over $33 million was to be paid to Standard General, its designees, and GRF and GRH (the shell companies that Standard General used to consummate the October 2014 Transaction).  $21 million of this was for the discount that Standard General had arranged for the Participating Lenders and for which RadioShack was now reimbursing Standard General.  An additional $1.5 million was due to Standard General's lawyers.  As a result, the fees and reimbursements due to Standard General accounted for over 30 percent of the immediate liquidity that the transaction was supposed to provide to RadioShack.  Although the Directors were advised of these enormous sums, no concerns were voiced, and, more importantly, no comparison of fees otherwise available in the market was ever requested or performed to determine whether the fees that Standard General was extracting from the company were either typical or fair.

**VI. Wells Fargo Steps in to Provide the Missing Link for the October 2014 Transaction, Despite Its Knowledge that the Transaction Would Harm the Company**

95.      While Kim and Standard General creatively designed the October 2014 Transaction to ensure Standard General's ultimate control over RadioShack, they were unwilling to use Standard General's own money to effect the multiple transfers required by the scheme.  As a result, they had to recruit a major bank to step in, finance the senior debt purchase from GE Capital, nominally acquire the loans from Standard General, and sell the loans on to the group of hedge funds that Standard General had assembled.  GE Capital wanted nothing to do with the arrangement, and attempts to involve other banks in this key role—including UBS—had met with no success.  Less than a month before the October 2014 Transaction, however, Wells Fargo stepped up to the plate.

96.      Wells Fargo knew exactly what it was getting into.  In the weeks before the transaction, the bank's analysts with the Distressed and Special Situations group at Wells Fargo Securities undertook a review of the transaction and Wells Fargo's proposed role. ███████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████  In simple words, they knew the company had to file for bankruptcy, and that the October 2014 Transaction did not change that fact.

97.      Indeed, as noted above, Wells Fargo's bankers joked that the company would not survive past March 15, 2015, and therefore that they should use their Christmas gift cards from RadioShack quickly.  They acknowledged to reporters that the transaction would keep the

company going "through Christmas."  As year-end approached, Wells Fargo bankers further quipped that they "might not wanna wait until next week" to do their shopping at RadioShack because of the likelihood it would no longer be in "bizness."  And when news reports in early January 2015 indicated that RadioShack was preparing for bankruptcy, the Wells Fargo managing director sarcastically responded, "shocker."

98.     Second, Wells Fargo knew that several of the hedge funds were motivated to participate in Standard General's scheme not because they were willing lenders, but because they were using the transaction to keep RadioShack alive for a few months to avoid paying out on the CDS insurance contracts to which they were parties. ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

99.     In the weeks after the October 2014 Transaction was completed, Wells Fargo bankers continued to focus on the hedge funds' improper motivations for the transaction that Wells Fargo enabled.  On December 5, 2014, for example, Jordan advised other Wells Fargo bankers about concerns that the hedge funds' obligations in the October 2014 Transaction "were structured with a purpose to manipulate the CDS market (i.e., to avoid triggering CDS contracts with a termination date of December 20, 2014)."

100.    Third, Wells Fargo knew about—and, indeed, was relying upon—the substantial discount that Standard General had induced RadioShack to provide on this first-priority senior debt.  As explained above, Wells Fargo paid a total of $304 million, with one part going to GE Capital and one part going directly to RadioShack, in exchange for $325 million in debt obligations from the company.  Wells Fargo paid these amounts purportedly to finance Standard

General's acquisition of the loans and, simultaneously, to acquire the loans from Standard General. Wells Fargo then immediately sold the loans on to the group of hedge funds in pre-arranged transactions. Wells Fargo passed much of the discount to the hedge funds, but kept a generous fee for ███████████████████████████████████ transaction because the subsequent sales were already arranged.

101. Notwithstanding its knowledge that the October 2014 Transaction would fail to provide anything but short-term liquidity to the company, that the company was burning through its assets at an alarming rate, and that the ultimate lenders had perverse motivations for participating in the transaction, Wells Fargo agreed to play the middleman role for Standard General—to provide the required finances to piece the transaction together—in exchange for a one-time fee derived from its share of the discount. Wells Fargo knew that the company lacked a justifiable rationale for proceeding with the October 2014 Transaction, but nonetheless acted as the crucial enabler.

102. Wells Fargo also knew—as it must have—that RadioShack's Directors had breached their duties in permitting the company to move forward with an obviously harmful transaction. Wells Fargo knew that the October 2014 Transaction could not possibly have been the result of a fair process because its terms were harmful to the company, ludicrously involved the participation of hedge fund lenders who, ███████████████████████████ ████████████████████ and was accomplished only by offering a substantial discount to these same lenders for their purchase of the senior, secured loan even though they were already incentivized to do the deal. Under no circumstance could Wells Fargo have believed that the Directors had fulfilled their fiduciary obligations by approving a transaction that would do nothing to promote the survival of the company's business, would instead result in the

45

unchecked dissipation of the company's assets, and was designed to benefit a group of hedge fund lenders that wanted to manipulate the timing of RadioShack's failure.

## VII.    The Directors Rubber Stamp the October 2014 Transaction

103.    On October 2, 2014, in a two-hour board meeting—which several of the participants attended telephonically—the Directors unanimously approved the October 2014 Transaction.  The transaction was effected immediately.  On October 3, GRH, GRF, other affiliates of Standard General, and the Participating Lenders acquired the Credit Agreement loans pursuant to a loan sale agreement (the "Loan Sale Agreement").    RadioShack simultaneously entered into an amendment to the Credit Agreement with the Participating Lenders and Cantor Fitzgerald Securities LLC, in its capacity as successor to GE Capital as administrative and collateral agent (the "First Amendment").  As planned, the First Amendment provided for: (1) the conversion of outstanding revolving loans to a term loan in an aggregate principal amount of up to $275 million; (2) $120 million to cash collateralize letters of credit; and (3) $140 million in new revolving loans (which were never actually made available because the company could not satisfy the borrowing requirements).    RadioShack and GRH simultaneously entered into the "Recapitalization and Investment Agreement," which provided for the rights offering and debt-to-equity conversion in the unlikely event that RadioShack thrived in the 2014 holiday season.

104.    At the time of the October 2 board meeting—and for many months preceding that meeting—the Directors knew that the transaction constituted a change in control.  Six months earlier, they had expanded the scope of PJSC's engagement to conduct a sale of company. Materials circulated to the Board, including packets prepared for the July 17, 2014 Board meeting, expressly recognized that a financing entailing "equity-linked capital" would constitute a "change of control transaction." And the October 2014 Transaction contemplated Standard

General's acquisition of 50 to 80 percent of RadioShack's shares. Accordingly, the Directors were charged with the duty of maximizing the company's value at a sale. The Directors were responsible for getting the most value—the best price—for the company, whether through a sale or an alternative transaction, including a bankruptcy filing, even if that meant an orderly sale of assets to the highest bidder or groups of bidders. In carrying out this duty, the Directors were no longer permitted to consider the company's long-term prospects.

105. Rather than pursue their obligation to seek maximum value—in large part by giving due consideration to all options available to the company—the Directors, following Magnacca's known to be conflicted lead, exclusively pursued Standard General's recapitalization proposal. Their errors went well beyond poor choices in managing the company or the required sale process; rather, the Directors intentionally disregarded their duties, choosing to favor a transaction with Standard General rather than pursuing an array of options that could have—and, in fact, would have—achieved greater realizable value and avoided the continuing accumulation of losses and destruction of value for all of the company's constituents.

106. First, and obvious to all of the Directors, the Directors permitted—indeed, authorized—Magnacca to take the lead in negotiating with Standard General. They expressly declined to create a special board committee to deal with Standard General, even though they knew—and, remarkably, approved—Standard General's appointment of Magnacca to the board of another company. The record could hardly be clearer that Magnacca was Standard General's inside-man at the company; Magnacca expressly acknowledged as such in his texts to Kim. By permitting Magnacca (a) to work so closely *with* and for Standard General, (b) to simultaneously lead the negotiations *against* Standard General, and (c) to guide the company in failing to consider alternative options or to heed the advice of retained experts, the Directors abandoned

their duties to achieve the highest and best value possible.  By putting Magnacca in charge, after acknowledging that his ties to Standard General called his allegiances into question, the Directors all but ensured that they would *not* be adequately informed of options available to the company.  Simply put, in following the lead of the openly conflicted CEO, the Directors failed to protect the interests of the corporation.

107.    Second, the Directors did not even attempt to critically assess the Standard General transaction that they readily approved.  It was clear to the Directors that the October 2014 Transaction would provide only short-term liquidity—and a minimal amount, at that—and thus that new debt facilities would need to be obtained somehow somewhere before the re-imposition of discretionary borrowing base reserves in a few short months.  Board minutes expressly reflect the Directors' knowledge that Standard General's plan was not a "long-term solution as it does not address the need to refinance or obtain covenant relief under the Company's term loan facility and only suspends the ability of the agent under the Company's ABL credit facility to impose discretionary borrowing base reserves until March 15, 2015."  Yet the Directors did not attempt to determine the availability of replacement financing, or even inquire what terms would be required to obtain such financing.  Magnacca, who led the effort, conceded that he "didn't concern himself" with such issues.

108.    Similarly, the Directors made no attempt to address issues that rendered the October 2014 Transaction unworkable.  While they knew that the transaction rested on a business plan requiring thousands of store closings, they also knew that lender consent for those closings had not been obtained, and that their repeated efforts to obtain such consent led to a dead end.  They knew that the business forecast underlying the projected debt-to-equity conversion was fanciful.  They knew that continuing to operate after completion of the October

2014 Transaction would continue to burn cash and permit company assets to dwindle. They knew that mobility carrier consent would be required to permit a revised operating plan and budget that could support the contemplated conversion. The list continues, but the theme remains constant—although squarely faced with these issues, the Directors made no attempt to substantively address them.

109.    Third, the Directors failed to compare the Standard General-led recapitalization, itself a change in control transaction, to available alternatives and, accordingly, failed to act as the auctioneers they were required to be. The Directors could have undertaken an apples-to-apples analysis to determine what option would result in the most immediate value to the company and its stakeholders; alternatives to the Standard General transaction included at the very least a debt-for-equity exchange with the bondholders or a liquidation of the company's assets to the highest bidder or bidders. Yet, at no time did the Directors compare the results of these options to the price obtained for the company and its stakeholders by the October 2014 Transaction.

110.    Given the company's admitted insolvency, the Board was charged with maximizing enterprise value, and it should have ascribed importance to the relative recovery of creditors in competing scenarios. The company's own liquidation analysis, as presented to the Board, showed that unsecured creditors would receive up to a 21 percent recovery (or $184 million) in a liquidation as of October 2, 2014. But there was no attempt to translate this into an enterprise value, to evaluate the enterprise value of the company after the Standard General-led transaction, or to compare those values. Similarly, there was no attempt to compare the value to the company of a bondholder-led restructuring as compared to the transaction undertaken with

Standard General.  It was as though kicking the can down the road or avoiding bankruptcy is by definition a value-maximizing idea—it is not.

111.    The Directors' failures went well beyond choosing a poor option.  The Directors knowingly put themselves in a position where they lacked the information to make an informed choice.  By the time of the October 2 board meeting, they were told that they faced a simple, binary choice:  undertake the transaction with Standard General, or file for bankruptcy and liquidate.  The Directors were in no position to assess the accuracy of that dichotomy, given their failure to consider alternatives identified by their advisors.  And while Standard General repeatedly insisted that the company avoid "Plan B" (bankruptcy) because it would only lead to liquidation, the Directors never once stopped to ask why that was the case or whether that was in fact the best way to maximize value.  Indeed, even if the simple dichotomy were accurate, the Directors made no attempt to compare the values resulting from those two choices.  Rather than obtain, and act with due care on, all material information reasonably available, including information to determine which choice (or an alternative course of action) would provide the best value reasonably available to the company, the Directors followed the lead of their conflicted CEO and signed on to an unworkable transaction that ultimately damaged the company and wiped out is creditors.

112.    Had the Directors properly discharged their fiduciary obligations, RadioShack would have been sold or filed for bankruptcy much sooner than it did, and there would have been far more value in the company to be distributed than there was upon the company's ultimate filing in February 2015.  Between October 2, 2014 (the day before the October 2014 Transaction) and the company's bankruptcy filing, total assets available for distribution fell by no less than $180 million.  This massive diminution in RadioShack's value prior to the Petition

Date could have been avoided had the Directors attempted to assess and value alternatives to Standard General's proposal.

113.    Indeed, demonstrating the Directors' and Standard General's recognition that the October 2014 Transaction was so extraordinary and such a losing gamble on RadioShack's future—a gamble that the Directors were precluded from undertaking—the parties baked into the Recapitalization and Investment Agreement a purported "non-recourse" provision seeking to limit claims against them, other than for fraud, arising from that Agreement and the October 2014 Transaction as a whole.  This non-recourse provision was self-servingly inserted into the Recapitalization and Investment Agreement (at section 11.13) as a blatant attempt to shield the parties from the very misconduct they were undertaking.  Similarly, Standard General stapled to the transaction documents, with the Directors' approval, various releases and indemnification provisions purportedly for its benefit and the benefit of its subsidiaries, GRF and GRH, relating to the October 2014 Transaction.  These purported protections—which were not supported by adequate consideration to the company—are necessarily ineffectual.   Moreover, assuming *arguendo* that these indemnification provisions were not impermissible, any valid indemnification claim against RadioShack would serve only to offset partially the liability stemming from the damage Standard General and its affiliates caused RadioShack.

## VIII.  No Surprise, the October 2014 Transaction Facilitated Standard General's Foreclosure on RadioShack's Assets

114.    As Standard General, Magnacca, and the other Directors knew, at the time of the October 2014 Transaction, RadioShack was insolvent.   The company was already losing approximately $1 million each day, with the recapitalization plan providing it with only temporary relief.  Demonstrating the parties' understanding as to RadioShack's insolvency, any

and all representations that RadioShack was solvent were stricken from the Credit Agreement pursuant to the First Amendment.

115.    The October 2014 Transaction did nothing to reverse RadioShack's insolvency. RadioShack's stock fell by approximately 12 percent following the announcement of the October 2014 Transaction.  The markets were not convinced that RadioShack had been rescued.  A Fitch Ratings analyst described the October 2014 Transaction as a "short term respite," warning that "the risk of a restructuring, in or outside of bankruptcy, including a distressed debt exchange, that is detrimental to bondholders remains high over the next several months given the material deterioration in liquidity and no visible signs that RadioShack can turn operations around."  Only weeks later, RadioShack brought in yet another turnaround specialist, The MAEVA Group ("MAEVA"), which had economic incentives tied to and was hand-picked by Standard General, to advise RadioShack during its efforts to turn the company's businesses and operations around. MAEVA's Chief Executive Officer, Harry Wilson, a former hedge fund manager, assumed the role of "Chief Revitalization Officer," while Michael Cole, the other principal of MAEVA, was initially selected by Standard General to join the board of RadioShack as one of Standard General's appointees.

116.    Continuing on its downward spiral, RadioShack announced on December 11, 2014 that its third-quarter results showed a same-store sales decline of approximately 13.4 percent from the same period in 2013.  Top-line revenue fell 16.1 percent to $650.2 million.  On December 15, 2014, RadioShack hired FTI Consulting ("FTI") to provide advisory and interim management services, and replaced interim CFO Holly Etlin with FTI senior managing director Carlin Andrianopoli.  Finally, on February 2, 2015, the New York Stock Exchange announced that RadioShack's common stock was being delisted, and that it was immediately suspending

trading of the stock. Three days later, on February 5, 2015, RadioShack crash landed into bankruptcy.

117. None of these events was surprising to Standard General or the Directors. The fees associated with the October 2014 Transaction wiped out much of the new liquidity on the first day. The conditions for the equity conversion were never close to being satisfied. And the Term Loan lenders' consent to close stores was never going to be obtained. The $120 million letter of credit facility, which enabled the temporary release of the borrowing base reserves and was supposed to provide near-term liquidity, failed to materialize benefits for the company because suppliers, wary of RadioShack's prospects, were still unwilling to ship new inventory based on letters of credit alone. The company was forced to pre-pay vendors to obtain shipment, which prevented a build up of inventory for the 2014 holiday season. All the major mobile carriers refused to supply the latest iPhones. The inability to build up inventory, in turn, caused continued shrinkage of the borrowing base, thus preventing RadioShack from ever accessing the $140 million revolver and forcing it to repay tens of millions of dollars under the term loan before the month of October even ended.

118. Standard General, having structured the October 2014 Transaction such that it (along with the group of hedge funds) held the senior-most position in the company's capital structure, completed its exploitation of RadioShack's fatal circumstances by leveraging its senior secured position to essentially foreclose (through a credit bid of its debt) for only RadioShack's most profitable stores. Moreover, in stark contrast to Standard General's repeated urgings to Magnacca and the other Directors, Standard General itself chose to pursue a smaller RadioShack, which is exactly what the company's advisors had suggested a year earlier, and what the company had decided prior to Standard General's insistence on changing course.

119.    On the same day Standard General completed its acquisition of RadioShack's most desirable stores, Magnacca submitted his resignation from RadioShack.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### AGAINST THE DIRECTORS (INCLUDING MAGNACCA)
**(Breach of Fiduciary Duty)**

120.    The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

121.    As members of RadioShack's Board of Directors, Magnacca and the other Directors owed the company fiduciary duties of care and loyalty.  Because RadioShack was insolvent, the Directors owed these fiduciary duties derivatively to RadioShack's creditors, as the ultimate bearers of risk and beneficiaries of any residual value.  Moreover, the Directors had placed the company up for sale and understood, and had been advised, that the recapitalization plan the company was negotiating with Standard General was a change of control transaction.  As a result of these circumstances, Magnacca and the other Directors were obligated to maximize the short-term value of the company by aggressively marketing it to potential buyers, not to play favorites with the company's largest (and controlling) shareholder, Kim and Standard General, and to ensure that any transaction was fair and in the best interests of the company, and derivatively to its creditors.

122.    In breach of these fiduciary duties, the Directors deliberately and repeatedly abandoned all reasonable process in favoring Standard General's recapitalization and change of control plan over other alternatives that were more beneficial to the company and its creditors. For example, they:

a.  failed to take steps, such as conducting an auction, to maximize the short-term value of the company when it was put up for sale starting in April 2014 or at any point thereafter prior to the closing of the October 2014 Transaction;

b.  allowed Magnacca, who they knew to be conflicted due to his separate and close relationship with Standard General, to act as the primary negotiator for RadioShack against Standard General;

c.  failed to compare the value to the company of the October 2014 Transaction versus alternatives, such as liquidation or a restructuring with bondholders, including a failure to critically assess the contingencies embedded in the October 2014 Transaction;

d.  failed to market the company aggressively and instead favored Standard General by granting it greater access to the company's senior management than alternative transaction parties;

e.  failed to pursue alternatives with the same vigor and attention as they did with Standard General;

f.  actively discouraged the company's advisors from fully and fairly exploring alternatives, including potentially maximizing value through liquidation;

g.  made no attempt to assess the reasonableness of the fees paid in the October 2014 Transaction or compare them to what was otherwise available on the market; and

h.  failed to oversee the sale process and abdicated any supervision over Magnacca, which was particularly improper in light of Magnacca's conflict stemming from his relationship with Standard General.

123.   In complete abandonment of their fiduciary duties and by failing to undertake even the slightest care to implement a fair process to sell or restructure RadioShack or otherwise evaluate its alternatives, the Directors failed to act with a good faith belief that their conduct was in the best interests of the company. Rather, lacking good faith, the Directors allowed RadioShack to enter into a transaction that they knew was detrimental to the company, and, by the natural consequences of the October 2014 Transaction, harmful to RadioShack's creditors. As the Directors were aware, and had been advised, the entire basis of the October 2014 Transaction was a set of contingencies that were impossible to achieve, including a refinancing of all of the company's indebtedness by no later than March 15, 2015, and obtaining the Term Loan lenders' consent to an extensive store closure program.

124.   As a direct, proximate, and foreseeable result of Magnacca's and the other Directors' breaches of fiduciary duties, RadioShack, and derivatively its unsecured creditors, were damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## <u>AGAINST MAGNACCA (AS AN OFFICER OF RADIOSHACK)</u>
### (Breach of Fiduciary Duty)

125.   The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

126.   Magnacca was formerly RadioShack's CEO. As an officer of the company, Magnacca owed the company fiduciary duties of care and loyalty. Because RadioShack was insolvent, Magnacca also derivatively owed fiduciary duties to RadioShack's creditors, as the ultimate bearers of risk and beneficiaries of any residual value. Moreover, Magnacca, along with the other Directors, had placed the company up for sale and understood, and had been advised, that the recapitalization plan the company was negotiating with Standard General was a change

of control transaction.  As a result of these circumstances, Magnacca was obligated to maximize the short-term value of the company by aggressively marketing it to potential buyers, not to play favorites with the company's largest (and controlling) shareholder, Kim and Standard General, and to ensure that any transaction was fair and in the best interests of the company, and derivatively to its creditors.

127.    In breach of his fiduciary duties, Magnacca deliberately and repeatedly favored Standard General's interests over the best interests of the company and its creditors.  Magnacca expressly acknowledged his allegiance to Standard General, pledging to Kim that he would be "anyplace" at "anytime" for Standard General, agreeing with Kim to "clear house" at RadioShack, and heeding Kim's instructions to exclude the company's advisors.  By virtue of his close relationship with Standard General, in which he was rewarded for advancing its plans (such as through his appointment to the board of American Apparel), Magnacca acted under a conflict of interest in serving as RadioShack's chief negotiator for the October 2014 Transaction.   In furthering Standard General's interests over RadioShack's, Magnacca:

    a.   failed to take steps, such as conducting an auction, to maximize the short-term value of the company when it was put up for sale starting in April 2014 or at any point thereafter prior to the closing of the October 2014 Transaction;

    b.   failed to compare the value to the company of the October 2014 Transaction versus alternatives, such as liquidation or a restructuring with bondholders, including a failure to critically assess the contingencies embedded in the October 2014 Transaction;

    c.   failed to market the company aggressively and instead gave Standard General greater access to the company's senior management than alternative transaction parties;

    d.   failed to pursue alternatives with the same vigor and attention as he did with Standard General;

    e.   actively discouraged the company's advisors from fully and fairly exploring alternatives, including potentially maximizing value through liquidation; and

    f.   made no attempt to assess the reasonableness of the fees paid in the October 2014 Transaction or compare them to what was otherwise available on the market.

128.    In complete abandonment of his fiduciary duties and by failing to undertake even the slightest care to implement a fair process to sell or restructure RadioShack or otherwise evaluate its alternatives, Magnacca failed to act with a good faith belief that his conduct was in the best interests of the company. Rather, lacking good faith, Magnacca allowed RadioShack to enter into a transaction that he knew was detrimental to the company, and, by the natural consequences of the October 2014 Transaction, harmful to RadioShack's creditors. As Magnacca was aware, and had been advised, the entire basis of the October 2014 Transaction was a set of contingencies that were impossible to achieve, including a refinancing of all of the company's indebtedness by no later than March 15, 2015, and obtaining the Term Loan lenders' consent to an extensive store closure program.

129.    As a direct, proximate and foreseeable result of Magnacca's breaches of fiduciary duties, RadioShack, and derivatively its unsecured creditors, were damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## <u>AGAINST KIM, STANDARD GENERAL, AND THE FUNDS</u>
### (Breach of Fiduciary Duty)

130.    The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

131.    Kim, Standard General, and the Funds owed RadioShack fiduciary duties of care and loyalty by virtue of their status as the company's largest stockholder and their exercise of actual control and managerial power over corporate conduct.   Kim and Standard General's beneficial ownership of RadioShack's stock was through the Funds.   Standard General served as the investment manager of the Funds and exercised voting and investment control over securities held for the accounts of the Funds.

132.    These defendants exercised managerial power, including through control of Magnacca, who the Board failed to oversee and to whom it abdicated it responsibilities.   After appointing Magnacca to the board of American Apparel, Kim and Standard General worked directly with Magnacca on the October 2014 Transaction, as instructed by the Directors. Standard General exercised control over Magnacca and RadioShack by, among other things:

  a.  directly instructing Magnacca on how to deal with competing constituencies, including bondholders;

  b.  undermining the advice of the company's advisors and maligning those advisors to Magnacca;

  c.  urging Magnacca to "clear house" when the transaction was completed;

  d.  obtaining a position on the company's Transaction Committee as part of the October 2014 Transaction; and

  e.  expressly enticing Magnacca with additional retail opportunities that Standard General could provide to him.

Indeed, owing to this control, at the critical time when RadioShack needed a disinterested arm's-length negotiator against Standard General, Magnacca informed Kim and Standard General that "I'm all in with you."

133.   In breach of their fiduciary duties, Kim, Standard General, and the Funds exploited their control and influence to prevent RadioShack from filing for bankruptcy for an extended period of time and from negotiating with other potential sources of financing or restructuring, including the organized group of existing bondholders.

134.   In addition, by using their control and influence, Kim, Standard General, and the Funds pushed RadioShack to complete the October 2014 Transaction, which they knew was a transaction that only benefitted it to the detriment of the company and its unsecured creditors.  In particular, they knew that the entire foundation of the October 2014 Transaction and its contemplated recapitalization plan was based on contingencies that were impossible to achieve, including a refinancing of all of the company's indebtedness by no later than March 15, 2015, and obtaining the Term Loan lenders' consent to an extensive store closure plan.

135.   As a direct, proximate and foreseeable result of Kim, Standard General, and the Funds' breaches of fiduciary duties, RadioShack, and derivatively its unsecured creditors, were damaged in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### AGAINST KIM AND STANDARD GENERAL
**(Knowing Participation in / Aiding and Abetting Breach of Fiduciary Duty)**

136.   The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

137.   As set forth in detail above, Magnacca, as both an officer and director of RadioShack, and the other Directors breached their fiduciary duties of care and loyalty by, among other things:

a.  failing to take steps to maximize value received for the company when it was put up for sale starting in April 2014, or at any point thereafter prior to the closing of the October 2014 Transaction;

b.  permitting Magnacca, who they knew to be conflicted due to his separate close relationship with Standard General, to act as primary negotiator for RadioShack against Standard General;

c.  failing to compare the value to the company of the October 2014 Transaction versus alternatives, such as liquidation or a restructuring with bondholders, including a failure to critically assess the contingencies embedded in the October 2014 Transaction;

d.  failing to market the company aggressively and instead favoring Standard General by granting it greater access to the company's senior management than alternative transaction parties;

e.  failing to pursue alternatives with the same vigor and attention as they did with Standard General;

f.  actively discouraging the company's advisors from fully and fairly exploring alternatives, including potentially maximizing value through liquidation;

g.  making no attempt to assess the reasonableness of the fees paid in the October 2014 Transaction or compare them to what was otherwise available on the market; and

h.  failing to oversee the sale process and abdicating any supervision over Magnacca, which was particularly improper in light of Magnacca's conflict stemming from his relationship with Standard General.

138.     As set forth in detail above, Kim and Standard General had actual knowledge that Magnacca and the Directors owed fiduciary duties to RadioShack, by virtue of their positions with the company, and had actual knowledge that they had breached those duties.

139.     Kim and Standard General knew that the October 2014 Transaction was detrimental to the company and, derivatively, the company's pre-existing unsecured creditors. They knew that the October 2014 Transaction would not provide anything beyond short-term liquidity to the company that was inadequate to address the company's issues because the lenders would re-impose discretionary borrowing base reserves on March 15, 2015. They further knew that the transactional premise that the company would refinance both the Salus-led Term Loan and the amended ABL facility (owned by the hedge funds) in the near term was fatally flawed, given their knowledge that first lien debt secured by the company's most liquid assets could not be placed without a steep discount to par.

140.     Kim and Standard General substantially assisted Magnacca and the Directors' breaches of their fiduciary duties by, among other things:

  a.  appointing Magnacca to the board of American Apparel to secure an inside position at RadioShack;

  b.  knowingly creating a conflict for Magnacca, the lead negotiator in the transaction with Standard General and driving force in whether to pursue alternative transactions;

  c.  attacking RadioShack's advisors to prevent the Board from listening to advice about alternative transactions/approaches and depriving RadioShack's advisors of full information by encouraging Magnacca to withhold information about alternative paths from RadioShack's advisors;

> d. inducing the company to limit the number of store closures to the detriment of RadioShack;
>
> e. inducing the Board to forego a bankruptcy option or negotiate with other potential sources of financing or restructuring, including the organized group of existing bondholders; and
>
> f. pushing the company to complete the October 2014 Transaction, which Kim and Standard General knew was a transaction that only benefitted them to the detriment of the company and its unsecured creditors.

141. Kim's and Standard General's conduct, as alleged herein, offended the public's traditional sense of justice and propriety, and was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the company or its constituents.

142. As a direct, proximate and foreseeable result of Kim's and Standard General's misconduct, RadioShack, and derivatively its unsecured creditors, were damaged in an amount to be determined, together with exemplary damages, at trial.

### FIFTH CAUSE OF ACTION
### AGAINST GRH, GRF, AND STANDARD GENERAL (AS THEIR ALTER EGO)
#### (Knowing Participation in / Aiding and Abetting Breach of Fiduciary Duty)

143. The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

144. As set forth in detail above, Magnacca, as both an officer and director of RadioShack, and the other Directors breached their fiduciary duties of care and loyalty.

145. GRH and GRF had actual knowledge that Magnacca and the Directors owed fiduciary duties to RadioShack by virtue of their positions with the company, and had actual knowledge that Magnacca and the Directors breached those duties.

146.    GRH and GRF knew that the October 2014 Transaction was detrimental to the company and, derivatively, the company's pre-existing unsecured creditors.  They knew that the October 2014 Transaction would not provide anything beyond short-term liquidity to the company that was inadequate to address the company's issues because the lenders would re-impose discretionary borrowing base reserves on March 15, 2015.  They further knew that the transactional premise that the company would refinance both the Salus-led Term Loan and the amended ABL facility (owned by the hedge funds) in the near term was fatally flawed, given their knowledge that first lien debt secured by the company's most liquid assets could not be placed without a steep discount to par.

147.    GRH and GRF substantially assisted Magnacca and the Directors' breaches of their fiduciary duties.  Indeed, by any reasonable measure, GRH and GRF are controlled by Soohyung Kim, the Managing Partner and Chief Investment Officer of Standard General, and his actions detailed above to steer RadioShack away from any fair process or consideration of any strategic alternatives so as to push the company to complete the Standard General-led October 2014 Transaction, including through his improper influence over Magnacca, are as attributable to GRH and GRF as they are to Standard General.

148.    GRH's and GRF's conduct, as alleged herein, offended the public's traditional sense of justice and propriety, and was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the company or its constituents.

149.    As a direct, proximate and foreseeable result of GRH and GRF's misconduct, RadioShack, and derivatively its unsecured creditors, were damaged in an amount to be determined, together with exemplary damages, at trial.

150.    In addition, Standard General is liable for the tortious conduct of GRH and GRF, as they are all properly treated as a single entity under the doctrine of "alter ego."  GRH and GRF are part of a single, interconnected web of investment vehicles under the common ownership and control of Standard General and its Chief Investment Officer.  Upon information and belief, GRH and GRF were created by Standard General in September 2014 solely to effectuate the October 2014 Transaction, including by acquiring RadioShack's debt and receiving and holding the millions of dollars of fees paid to Standard General in connection with that Transaction.  At closing, their balance sheets reflected only that Transaction.  The general partner of GRH is another Standard General affiliate, Standard General GP LLC, the CEO of which is Soohyung Kim.  Another Standard General related entity, Standard General Master Fund L.P., "absolutely, unconditionally and irrevocably guarantee[d]" GRF's obligations under the First Amendment. On information and belief, GRH and GRF exist only on paper, comprising only accounts whose transactions were dictated by Standard General for its own purposes—one of which was to shield the assets under its management from liability for fraud.  On information and belief, neither GRH nor GRF maintain offices separate from Standard General.  Indeed, documents memorializing the October 2014 Transaction reflect GRH and GRF as having the address "c/o Standard General, L.P."  Further, Standard General, GRH and GRF share common officers, such as Joseph Mause, who serves as the Chief Financial Officer for all three entities. Accordingly, all liabilities of GRH and GRF are also liabilities of Standard General.

### SIXTH CAUSE OF ACTION
### AGAINST STANDARD GENERAL, GRH AND GRF
#### (Unjust Enrichment and Restitution)

151.    The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

152.     In connection with the October 2014 Transaction, Standard General arranged to have RadioShack pay enormous sums to GRH and GRF, the two shell entities that Standard General used to consummate the Transaction.  In particular, as a result of the Transaction, RadioShack paid $25.175 million to GRF in purported fees and expenses, and another $6.6 million to GRH.  Standard General also arranged to have RadioShack pay $1.5 million to Standard General's attorneys, for Standard General's sole benefit.

153.     These collective payments of approximately $33.275 million unjustly enriched Standard General, GRF and GRH at RadioShack's expense because Standard General orchestrated them in connection with a transaction that was detrimental to RadioShack and would not result in a recapitalization of the company, as the conditions for that recapitalization could never be achieved, and the plan was designed only to place Standard General's interest in RadioShack ahead of the interests of the company and its creditors.  Moreover, to achieve the self-serving October 2014 Transaction, Standard General manipulated the company, through its influence over Magnacca, to pursue the Transaction while ignoring alternative strategies that actually would have been beneficial to the company and its creditors.

154.     The unjust nature of these payments is further demonstrated by the fact that approximately $21 million of the sum that RadioShack paid to GRF was in the form of a discount on the acquisition of RadioShack's debt, and thus enabled Standard General to enjoy a substantially enhanced return upon its purchase of the loans under the Credit Agreement. Standard General passed the benefit of this discount along to Wells Fargo and, subsequently, the hedge funds that ultimately purchased the debt.  This discount, which was specifically reflected as a fee by Standard General's subsidiary GRF, provided no benefit to the company.

155.    Equity and good conscience therefore require Standard General, GRH, and GRF to disgorge these ill-gotten gains.

## SEVENTH CAUSE OF ACTION
## AGAINST KIM, STANDARD GENERAL, GRH, AND GRF
### (Actual Fraudulent Transfer)
(11 U.S.C. §§ 544, 548(a)(1)(A) and 550 and Texas State Fraudulent Transfer Law)

156.    The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

157.    In connection with the October 2014 Transaction, Kim and Standard General arranged to have RadioShack pay enormous sums to GRH and GRF, the two shell entities that Standard General used to consummate the Transaction.    In particular, as a result of the Transaction, RadioShack paid $25.175 million to GRF in purported fees and expenses, and another $6.6 million to GRH.    Standard General also arranged to have RadioShack pay $1.5 million to Standard General's attorneys, for Standard General's sole benefit.

158.    These collective payments of approximately $33.275 million were at the behest of insiders, Kim and Standard General.    In addition to being the company's largest stockholder, Kim and Standard General manipulated RadioShack through their improper control and influence over RadioShack's CEO, Magnacca, whom Standard General rewarded for his loyalty by appointing him to the board of directors of American Apparel, another Standard General-controlled company.    As a result of its insider status, Standard General marginalized the company's advisors in order to push through the October 2014 Transaction and made its direct participation on the company's Transaction Committee  a condition of that Transaction.

159.    These payments were also made with actual intent to hinder, delay or defraud other creditors.    Like Standard General, the company intended the natural—and in fact anticipated—consequence of the October 2014 Transaction, which was the further impairment of

the obligations owed to the company's unsecured creditors, without any benefit whatsoever to the company. To that end, the October 2014 Transaction merely prolonged RadioShack's demise and tied its continued existence to a near-term recapitalization of the company and refinancing of its debts by March 2015 that, as Standard General and the Directors knew, could never have been achieved. Indeed, in arranging this $33.275 million in payments, Standard General was also uniquely aware that the company's true cost of borrowing prevented a future refinancing of its debt. In particular, Standard General was fully aware that it had to arrange a steep discount to secure the involvement of the Participating Lenders, several of which were also motivated in part by their desire to prop up RadioShack long enough so that many of them could avoid losing money on timed bets they had placed on RadioShack through CDS contracts.

160. In addition, these payments were made for the benefit of Kim and Standard General and to allow them to carry out the October 2014 Transaction, which was to their sole benefit. For example, although $21 million of this sum was nominally to cover a purported financing fee, that amount was in reality the discount that Standard General had arranged for the Participating Lenders to make the October 2014 Transaction even possible. That discount reflected nothing more than RadioShack, not Standard General, paying for Standard General's cost of flipping the debt to the Participating Lenders.

161. The $33.275 million in fees paid to or for the benefit of Kim, Standard General, GRH and GRF thus should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A) and 550 and Texas state fraudulent transfer law.

162. To the extent any of the payments to GRH and GRF were later transferred to Kim or Standard General, those payments should be avoided and recovered from Kim and Standard General, as subsequent transferees, pursuant to 11 U.S.C. § 550(a)(2).

## EIGHTH CAUSE OF ACTION
## AGAINST KIM, STANDARD GENERAL, GRH, AND GRF
### (Constructive Fraudulent Transfer)
(11 U.S.C. §§ 544, 548(a)(1)(B) and 550 and Texas State Fraudulent Transfer Law)

163.    The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

164.    In connection with the October 2014 Transaction, Kim and Standard General arranged to have RadioShack pay enormous sums to GRH and GRF, the two affiliated entities that Standard General used to consummate the Transaction.   In particular, as a result of the Transaction, RadioShack paid $25.175 million to GRF in purported fees and expenses, and another $6.6 million to GRH.   Standard General also arranged to have RadioShack pay $1.5 million to Standard General's attorneys, for Standard General's sole benefit.

165.    When these collective payments of approximately $33.275 million were made, RadioShack was (i) insolvent or became insolvent because of them; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the company was an unreasonably small capital; or (iii) intended to incur, or believed that the company would incur, debts that would be beyond the company's ability to pay as such debts matured.

166.    In addition, these payments were for less than reasonable or fair equivalent value and not within market norms.   The total fees and costs for the October 2014 Transaction amounted to approximately $40 million, or 37 percent of the $108 million of liquidity that the Transaction was supposed to provide to RadioShack.   The $33.275 million in fees paid to or for the benefit of Standard General, GRH and GRF accounted for over 30 percent of the additional liquidity.   Although these fees eliminated much of the immediate liquidity that was supposed to

result from the October 2014 Transaction, the Directors made no attempt to assess their reasonableness or compare them to what was otherwise available on the market.

167.    In addition, these payments were made for the benefit of Kim and Standard General and to allow them to carry out the October 2014 Transaction, which was again to their sole benefit.  For example, although $21 million of this sum was nominally to cover a purported financing fee, that amount was in reality the discount that Standard General had arranged for the Participating Lenders to make the October 2014 Transaction even possible.  That discount reflected nothing more than RadioShack, not Standard General, paying for Standard General's cost of flipping the debt to the Participating Lenders.

168.    The $33.275 million in fees paid to or for the benefit of Kim, Standard General, GRH, and GRF thus should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(B) and 550 and Texas state fraudulent transfer law.

169.    To the extent any of the payments to GRH and GRF were later transferred to Kim or Standard General, those payments should be avoided and recovered from Kim and Standard General, as subsequent transferees pursuant to 11 U.S.C. § 550(a)(2).

### NINTH CAUSE OF ACTION
### AGAINST WELLS FARGO
**(Knowing Participation in / Aiding and Abetting Breach of Fiduciary Duty)**

170.    The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

171.    As set forth in detail above, Magnacca, as both an officer and director of RadioShack, and the other Directors breached their fiduciary duties of care and loyalty by, among other things:

a. failing to take steps to maximize value received for the company when it was put up for sale starting in April 2014, or at any point thereafter prior to the closing of the October 2014 Transaction;

b. failing to compare the value to the company of the October 2014 Transaction versus alternatives, such as liquidation or a restructuring with bondholders, including a failure to critically assess the contingencies embedded in the October 2014 Transaction;

c. failing to pursue alternatives with the same vigor and attention as they did with Standard General; and

d. failing to oversee the sale process.

172.    As set forth in detail above, Wells Fargo had actual knowledge that Magnacca and the Directors owed fiduciary duties to RadioShack, by virtue of their positions with the company, and had actual knowledge that Magnacca and the Directors breached those duties. Wells Fargo knew that the October 2014 Transaction could not possibly have been the result of a process that was fair or that satisfied Magnacca and the other Directors' fiduciary duties. Indeed, Wells Fargo knew that the October 2014 Transaction was harmful to the company and, derivatively, the company's pre-existing unsecured creditors because it would not provide anything beyond short-term liquidity to the company and would result only in delaying the company's inevitable bankruptcy. Wells Fargo also knew that the Transaction was not designed with RadioShack's best interests in mind because it involved the Participating Lenders, ████████████████████████ ████████████████████████████████████████████ and who also obtained a substantial discount (paid for by RadioShack) for their purchase of the senior secured loan even though they were already incentivized to participate in the Transaction.

173.     Wells Fargo substantially assisted Magnacca and the Directors' breaches of their fiduciary duties by agreeing to finance this senseless transaction for a riskless profit derived from Wells Fargo's share of the discount that was arranged for it and the Participating Lenders. Without Wells Fargo's serving as the crucial money man, the disastrous October 2014 Transaction would never have gotten off the ground.  For Wells Fargo, the October 2014 Transaction was simply a way to make a quick buck at the expense of the company and, derivatively, the company's pre-existing unsecured creditors.

174.     Wells Fargo's conduct, as alleged herein, offended the public's traditional sense of justice and propriety, and was done purposefully, maliciously, recklessly, and without regard for the rights and interests of the company or its constituents.

175.     As a direct, proximate and foreseeable result of Wells Fargo's misconduct, RadioShack, and derivatively its unsecured creditors, were damaged in an amount to be determined, together with exemplary damages, at trial.

### TENTH CAUSE OF ACTION
### AGAINST WELLS FARGO
#### (Unjust Enrichment and Restitution)

176.     The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

177.     In connection with the October 2014 Transaction, Wells Fargo purchased $325 million of RadioShack's most secure debt for only $304 million (for a discount of $21 million). Wells Fargo then flipped the $325 million in loans to the Participating Lenders, passing along much of the $21 million difference that Standard General had obtained, but keeping for itself approximately $1.6 million as its riskless profit for making the October 2014 Transaction even

possible. As with the entirety of the $21 million discount, the $1.6 million that Wells Fargo put in its pocket was a direct loss to RadioShack.

178. This payment unjustly enriched Wells Fargo at RadioShack's expense because Wells Fargo obtained it in connection with a transaction that was detrimental to RadioShack and tied the company's continued existence to a near-term recapitalization and refinancing of its debts by March 2015 that, as Wells Fargo knew, could never have been achieved. Nonetheless, Wells Fargo made the October 2014 Transaction a reality by fronting the money for the deal so that it could make a quick profit for itself.

179. Equity and good conscience therefore require Wells Fargo to disgorge these ill-gotten gains.

**ELEVENTH CAUSE OF ACTION**
**AGAINST WELLS FARGO**
**(Actual Fraudulent Transfer)**
(11 U.S.C. §§ 544, 548(a)(1)(A) and 550 and Texas State Fraudulent Transfer Law)

180. The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

181. In connection with the October 2014 Transaction, Standard General engineered a discount to be paid by RadioShack that enabled Wells Fargo to purchase $325 million of RadioShack's most secure debt for only $304 million (for a discount of $21 million). Wells Fargo then flipped the $325 million in loans to the Participating Lenders, passing along much of the $21 million difference that Standard General had obtained, but keeping for itself approximately $1.6 million as its riskless profit for making the October 2014 Transaction even possible. As with the entirety of the $21 million discount, the $1.6 million that Wells Fargo put in its pocket was a direct loss to RadioShack.

182.    This $1.6 million payment was made with actual intent to hinder, delay or defraud other creditors.  In connection with making this payment, RadioShack intended the natural—and in fact anticipated—consequence of the October 2014 Transaction, which was the further impairment of the obligations owed to the company's unsecured creditors, without any benefit whatsoever to the company.  To that end, the October 2014 Transaction merely prolonged RadioShack's demise and tied its continued existence to a near-term recapitalization of the company and refinancing of its debts by March 2015 that, as Wells Fargo and the Directors knew, could never have been achieved.  Without the $21 million discount, of which Wells Fargo retained $1.6 million, Wells Fargo and the Participating Lenders would never have agreed to the deal and the October 2014 Transaction would not have been completed.

183.    The $1.6 million payment retained by Wells Fargo should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A) and 550 and Texas state fraudulent transfer law.

### TWELFTH CAUSE OF ACTION
### AGAINST WELLS FARGO
### (Constructive Fraudulent Transfer)
(11 U.S.C. §§ 544, 548(a)(1)(B) and 550 and Texas State Fraudulent Transfer Law)

184.    The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

185.    In connection with the October 2014 Transaction, Standard General engineered a discount to be paid by RadioShack that enabled Wells Fargo to purchase $325 million of RadioShack's most secure debt for only $304 million (for a discount of $21 million).  Wells Fargo then flipped the $325 million in loans to the Participating Lenders, passing along much of the $21 million difference that Standard General had obtained, but keeping for itself approximately $1.6 million as its riskless profit for making the October 2014 Transaction even

possible. As with the entirety of the $21 million discount, the $1.6 million that Wells Fargo put in its pocket was a direct loss to RadioShack.

186. When this $1.6 million payment was made, RadioShack was (i) insolvent or became insolvent because of it; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the company was an unreasonably small capital; or (iii) intended to incur, or believed that the company would incur, debts that would be beyond the company's ability to pay as such debts matured.

187. In addition, this payment was for less than reasonable or fair equivalent value and not within market norms. The total fees and costs for the October 2014 Transaction, including the payment to Wells Fargo, amounted to approximately $40 million, or 37 percent of the $108 million of liquidity that the Transaction was supposed to provide to RadioShack. Further, the $1.6 million paid to Wells Fargo was exorbitant ██████████████████████████

██████. Although the total fees eliminated much of the immediate liquidity that was supposed to result from the October 2014 Transaction, the Directors made no attempt to assess their reasonableness or compare them to what was otherwise available on the market.

188. The $1.6 million payment retained by Wells Fargo should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(B) and 550 and Texas state fraudulent transfer law.

## THIRTEENTH CAUSE OF ACTION
## AGAINST THE DIRECTORS, KIM, STANDARD
## GENERAL, GRH, GRF, AND THE FUNDS
### (Actual and Constructive Fraudulent Transfer)
(11 U.S.C. §§ 544, 548(a)(1)(A) and (B), and 550, and Texas State Fraudulent Transfer Law)

189. The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

190.    The Recapitalization and Investment Agreement, dated October 3, 2014, includes a "Non-Recourse" provision at section 11.13 that purports to preclude certain claims against the Directors, Kim, Standard General, GRH, GRF, and the Funds relating to that agreement and the contemplated recapitalization of RadioShack, other than for claims of fraud.

191.    The release of the company's rights to pursue such claims against these defendants was for less than reasonable or fair equivalent value and occurred when RadioShack was (i) insolvent or became insolvent because of this transfer; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the company was an unreasonably small capital; or (iii) intended to incur, or believed that the company would incur, debts that would be beyond the company's ability to pay as such debts matured.

192.    This release was also made with actual intent to hinder, delay, or defraud other creditors.

193.    Section 11.13 of the Recapitalization and Investment Agreement thus should be avoided pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A) and (B), and 550, and Texas state fraudulent transfer law.

### FOURTEENTH CAUSE OF ACTION
### AGAINST KIM, STANDARD GENERAL, GRH, GRF AND THE FUNDS
#### (Actual and Constructive Fraudulent Transfer)
(11 U.S.C. §§ 544, 548(a)(1)(A) and (B), and 550, and Texas State Fraudulent Transfer Law)

194.    The Committee repeats and realleges the foregoing allegations as though they were fully set forth here.

195.    The Recapitalization and Investment Agreement includes indemnification and release provisions at sections 9.2(a) and 9.3(a) purportedly for the benefit of Kim, Standard General, GRH, GRF, and the Funds.  Similarly, section 7(h) of the Loan Sale Agreement, dated

October 3, 2014, purports to release Kim, Standard General, GRH, GRF, and the Funds from all pre-transaction claims arising out of certain loan documents.

196.    The release of the company's rights to pursue such claims against these defendants and the incurrence of the obligation to indemnify them were for less than reasonable or fair equivalent value and when RadioShack was (i) insolvent or became insolvent because of these transfers and obligations; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the company was an unreasonably small capital; or (iii) intended to incur, or believed that the company would incur, debts that would be beyond the company's ability to pay as such debts matured.

197.    The release of the company's rights to pursue certain claims against these defendants and the incurrence of the obligation to indemnify them were also made with actual intent to hinder, delay or defraud other creditors.

198.    Sections 9.2(a) and 9.3(a) of the Recapitalization and Investment Agreement and section 7(h) of the Loan Sale Agreement thus should be avoided pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A) and (B), and 550, and Texas state fraudulent transfer law.

## **PRAYER FOR RELIEF**

WHEREFORE, the Committee respectfully requests:

a.    compensatory damages in amounts to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

b.    exemplary damages against Kim, Standard General, GRH, GRF, and Wells Fargo in an amount to be determined at trial;

c.    an order avoiding the payments to and any indemnification or exculpation in favor of Kim, Standard General, GRH, GRF and the Funds pursuant to 11 U.S.C. §§ 544, 548, 550 and Texas state fraudulent transfer law;

d.    an order avoiding any release of rights to assert claims against Kim, Standard General, GRH, GRF, and the Directors, including under the Recapitalization and Investment Agreement and the Loan Sale Agreement;

e.     reasonable costs and expenses incurred in this action, including, to the extent applicable, counsel fees; and

f.     such other relief as the Court deems just and proper.

Dated: Houston, Texas
      August 31, 2015

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

By:   /s/ Karl Stern
       Karl Stern
       TBA#19175665

       Pennzoil Place
       711 Louisiana St., Suite 500
       Houston, TX 77002
       Tel:   (713) 221 7000
       Fax:   (713) 221 7200
       karlstern@quinnemanuel.com

       *Attorneys for the Official Committee of*
       *Unsecured Creditors of RadioShack*
       *Corporation, et al.*

JS 44-TXND (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| | |
|---|---|
| **I. (a) PLAINTIFFS**<br><br>Official Commitee of Unsecured Creditors of RadioShack Corporation, et al. | **DEFENDANTS**<br><br>(see attachment) |
| **(b)** County of Residence of First Listed Plaintiff   Tarrant County<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant   N/A<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>        THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Karl Stern, Quinn Emanuel Urquhart & Sullivan, LLP<br>Pennzoil Place, 711 Louisiana St., Suite 500, Houston, TX 77002<br>Tel: (713) 221-7000 | Attorneys *(If Known)*<br><br>(see attachment) |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❑ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ❑ 2 U.S. Government Defendant
- ❑ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❑ 1 | ❑ 1 | Incorporated *or* Principal Place of Business In This State | ❑ 4 | ❑ 4 |
| Citizen of Another State | ❑ 2 | ❑ 2 | Incorporated *and* Principal Place of Business In Another State | ❑ 5 | ❑ 5 |
| Citizen or Subject of a Foreign Country | ❑ 3 | ❑ 3 | Foreign Nation | ❑ 6 | ❑ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❑ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❑ 625 Drug Related Seizure of Property 21 USC 881 | ❑ 422 Appeal 28 USC 158 | ❑ 375 False Claims Act |
| ❑ 120 Marine | ❑ 310 Airplane | ❑ 365 Personal Injury - Product Liability | ❑ 690 Other | ❑ 423 Withdrawal 28 USC 157 | ❑ 400 State Reapportionment |
| ❑ 130 Miller Act | ❑ 315 Airplane Product Liability | ❑ 367 Health Care/ | | | ❑ 410 Antitrust |
| ❑ 140 Negotiable Instrument | ❑ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ❑ 430 Banks and Banking |
| ❑ 150 Recovery of Overpayment & Enforcement of Judgment | ❑ 330 Federal Employers' Liability | Product Liability | | ❑ 820 Copyrights | ❑ 450 Commerce |
| ❑ 151 Medicare Act | ❑ 340 Marine | ❑ 368 Asbestos Personal Injury Product | | ❑ 830 Patent | ❑ 460 Deportation |
| ❑ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❑ 345 Marine Product Liability | Liability | **LABOR** | ❑ 840 Trademark | ❑ 470 Racketeer Influenced and Corrupt Organizations |
| ❑ 153 Recovery of Overpayment of Veteran's Benefits | ❑ 350 Motor Vehicle | **PERSONAL PROPERTY** | ❑ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❑ 480 Consumer Credit |
| ❑ 160 Stockholders' Suits | ❑ 355 Motor Vehicle Product Liability | ❑ 370 Other Fraud | ❑ 720 Labor/Management Relations | ❑ 861 HIA (1395ff) | ❑ 490 Cable/Sat TV |
| ❑ 190 Other Contract | ❑ 360 Other Personal Injury | ❑ 371 Truth in Lending | ❑ 740 Railway Labor Act | ❑ 862 Black Lung (923) | ❑ 850 Securities/Commodities/ Exchange |
| ❑ 195 Contract Product Liability | ❑ 362 Personal Injury - Medical Malpractice | ❑ 380 Other Personal Property Damage | ❑ 751 Family and Medical Leave Act | ❑ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ❑ 196 Franchise | | ❑ 385 Property Damage Product Liability | ❑ 790 Other Labor Litigation | ❑ 864 SSID Title XVI | ❑ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❑ 791 Employee Retirement Income Security Act | ❑ 865 RSI (405(g)) | ❑ 893 Environmental Matters |
| ❑ 210 Land Condemnation | ❑ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ❑ 895 Freedom of Information Act |
| ❑ 220 Foreclosure | ❑ 441 Voting | ❑ 463 Alien Detainee | | ❑ 870 Taxes (U.S. Plaintiff or Defendant) | ❑ 896 Arbitration |
| ❑ 230 Rent Lease & Ejectment | ❑ 442 Employment | ❑ 510 Motions to Vacate Sentence | | ❑ 871 IRS—Third Party 26 USC 7609 | ❑ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❑ 240 Torts to Land | ❑ 443 Housing/ Accommodations | ❑ 530 General | | | ❑ 950 Constitutionality of State Statutes |
| ❑ 245 Tort Product Liability | ❑ 445 Amer. w/Disabilities - Employment | ❑ 535 Death Penalty | **IMMIGRATION** | | |
| ❑ 290 All Other Real Property | ❑ 446 Amer. w/Disabilities - Other | **Other:** | ❑ 462 Naturalization Application | | |
| | ❑ 448 Education | ❑ 540 Mandamus & Other | ❑ 465 Other Immigration Actions | | |
| | | ❑ 550 Civil Rights | | | |
| | | ❑ 555 Prison Condition | | | |
| | | ❑ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ❑ 2 Removed from State Court
- ❑ 3 Remanded from Appellate Court
- ❑ 4 Reinstated or Reopened
- ❑ 5 Transferred from Another District *(specify)*
- ❑ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
11 U.S.C. §§ 544, 548(a)(1)(A), 548(a)(1)(B), 550
Brief description of cause:
Actual and Constructive Fraudulent Transfer

## VII. REQUESTED IN COMPLAINT:

❑ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
no less than $200 million

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ❑ No

## VIII. RELATED PENDING OR CLOSED CASE(S) IF ANY

*(See instructions):*   JUDGE  Reed C. O'Connor   DOCKET NUMBER  4:14-cv-00959-O

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 08/31/2015 | /s/ Karl Stern |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

Case 15-04076-rfn Doc 2-1 Filed 09/03/15 Entered 09/03/15 12:52:34 Page 80 of 81

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or a similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Attorney Signature.** Date and sign the civil cover sheet.

### Attachment To Civil Cover Sheet

**Defendants**

Kim, Soohyun; Magnacca, Joseph C.; Standard General L.P.; General Retail Holdings L.P.; General Retail Funding LLC; Standard General Master Fund L.P.; Standard General OC Master Fund L.P.; P Standard General Ltd.; Standard General Focus Fund L.P.; Wells Fargo Bank, N.A.; Abernathy, Robert E.; Belatti, Frank J.; Dobson, Julie A.; Feehan, Daniel R.; Lockhardt, H. Eugene; Messman, Jack L.; Woodbury, Edwina D.

**Attorneys (Defendants)**

Soohyung Kim; Standard General L.P.; General Retail Holdings L.P.; General Retail Funding LLC; Standard General Master Fund L.P.; Standard General OC Master Fund L.P.; P Standard General Ltd.; Standard General Focus Fund L.P.

Richard F. Hahn
Shannon R. Selden
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Tel: (212)-909-6000

Joseph Magnacca; Robert E. Abernathy; Frank J. Belatti; Julie A. Dobson; Daniel R. Feehan; H. Eugene Lockhart; Jack L. Messman; Edwina D. Woodbury

Alfredo R. Pérez
Weil, Gotshal & Manges LLP
700 Louisiana
Houston, TX 77002
Tel: (713) 546-5040

Wells Fargo Bank, N.A.

J. Cory Falgowski
Reed Smith LLP
1201 Market St., Suite 1500
Wilmington, DE 19801
Tel: (302)-778-7500