



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed June 8, 2016**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| RSH LIQUIDATING TRUST, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| -against- | § | ADVERSARY NO. 15-04076-rfn |
| | § | |
| Joseph C. Magnacca, Robert E. Abernathy, | § | |
| Frank J. Belatti, Julie A. Dobson, Daniel R. | § | |
| Feehan, H. Eugene Lockhardt, Jack L. | § | |
| Messman, and Edwina D. Woodbury, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION
## GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION TO DISMISS

In this case, the plaintiff, a trust created for the benefit of RadioShack's creditors, alleges

that chief executive officer and director Joseph Magnacca engineered a transaction that delivered

RadioShack into the hands of Standard General, its largest shareholder, in order to further

Magnacca's personal ambitions.  It also alleges that RadioShack's independent directors were fully aware of Magnacca's conflicted loyalties and yet permitted him to pursue his personal agenda, knowing that it likely would spell disaster for the company.

According to the Trust, Standard General's attempts to co-opt Magnacca's loyalty manifested themselves both in actions and assurances.  First, Standard General and its chief investment officer, Soohyung Kim, caused Magnacca to be appointed to the board of American Apparel, a struggling affiliate of Standard General.  Then, they led him to believe that other opportunities awaited him.  In return, Magnacca allegedly guided RadioShack into an ill-fated recapitalization transaction with Standard General and away from other alternatives that would have brought more value to the company.

The Trust alleges that the independent directors breached their duty of loyalty when they approved Magnacca's appointment to the board of American Apparel, and then made him the point man to negotiate with Standard General with respect to the financing that allegedly led to RadioShack's demise.

The complaint raises two nagging questions.  First, why would Magnacca sacrifice his position as head of one of America's most "iconic" retailers in exchange for such paltry and illusory consideration?  Second, why would the independent directors knowingly sacrifice the company so that Magnacca could achieve his personal agenda?  It never answers these questions.

One might say that it is not the plaintiff's job to explain the personal motivations of men and women; that the facts speak for themselves.  But, where, as here, the directors are said to have breached their duty of loyalty, it is fair to ask why.  That is because if there is no satisfactory answer, it suggests that the duty at issue is not loyalty, but care.

I find no cognizable claim that any of the directors of RadioShack, including Magnacca, breached his or her duty of loyalty. It is possible that the directors may have breached their duty of care. But, duty-of-care claims are exculpated by RadioShack's charter. So, all claims against parties in their capacities as directors must be dismissed. But, Delaware law provides no exculpation for claims against officers. Count two states a claim for breach of the duty of care against Magnacca in his capacity as CEO. So, the motion to dismiss that claim is denied.

## I. Principals and Parties

### A. RadioShack

RadioShack Corporation was a well-established retailer of consumer electrical goods for almost a century. (AC ¶ 23) Based in Fort Worth, Texas, it operated more than 4,100 stores throughout the United States. (*Id.*) On February 5, 2015, RadioShack filed for voluntary relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. (AC ¶ 15) RadioShack operated its business for less than 60 days following its bankruptcy filing. (*Id.*) Those operations ceased when the company closed more than half its operations, and sold substantially all of its remaining locations to Standard General. (*Id.*)

### B. Standard General

Standard General is an investment firm that manages "event driven" opportunity funds. (AC ¶ 36) Its managing partner and chief investment officer is Soohyung Kim. (*Id.*) Standard General and Kim beneficially owned 9.8 percent of RadioShack's common stock. (AC ¶ 37)

### C. The Trust

The plaintiff, RSH Liquidating Trust, was created by RadioShack's plan of reorganization, which was confirmed on October 2, 2015. (AC ¶ 19) The Trust was empowered by the plan to continue this lawsuit, which originally was filed by the Official Committee of Unsecured Creditors

for RadioShack.  (AC ¶ 17)  The principal beneficiaries of the Trust are creditors of RadioShack.  (AC ¶ 20)

## D.  The Defendants

Joseph C. Magnacca is the former chief executive officer and a former member of the board of RadioShack.  (AC ¶ 21)  The complaint alleges that Magnacca had conflicted loyalties when he negotiated the transaction that is the subject of this lawsuit.

Defendants Robert E. Abernathy, Frank J. Belatti, Julie A. Dobson, Daniel R. Feehan, H. Eugene Lockhardt, Jack L. Messman, and Edwina D. Woodbury are former members of RadioShack's board.  (AC ¶ 22)  While the complaint alleges that these directors breached their fiduciary duties to RadioShack, it does not challenge their disinterestedness or independence.

## II.  Facts

In early 2013 RadioShack hired Magnacca as CEO to lead the company in a hoped-for turnaround of its business.  (AC ¶ 25)  To assist Magnacca, the company hired AlixPartners to provide restructuring advice and Peter J. Solomon Company ("PJSC") to assist in raising capital.  (AC ¶ 26)  In December 2013 RadioShack entered into two new loan facilities:  a 5-year, $585 million secured credit agreement with G.E. Capital (the "G.E. Capital Loan"); and a $250 million term loan with Salus Capital Partners (the "Salus Loan").  (AC ¶¶ 27-28)  Significantly, the Salus Loan prohibited RadioShack from closing more than 200 stores in a year without Salus's  consent.  (AC ¶ 29)

Notwithstanding the new financing, in February 2014 the directors were advised that the company's liquidity prospects were so dire that they needed to consider "strategic alternatives such as joint ventures, partnership, investments and/or a sale . . . to maximize value for [the company's] stockholders."   (AC ¶ 31)   In March 2014 RadioShack announced that it would close

4

approximately 1,100 of its 4,300 stores. (AC ¶ 32) These closures would reduce working capital needs from $200-$250 million to $100-$150 million. (*Id.*) But Salus refused to consent to the closures. (AC ¶ 33) Because of that refusal, in April 2014 the directors expanded the scope of PJSC's engagement by directing it to follow a parallel path of raising capital or pursuing a sale transaction. (AC ¶ 34)

By July 2014 the company's liquidity prospects still had not improved. (AC ¶¶ 45-46) But, instead of pursuing a sale or other alternative, the directors began to consider a recapitalization plan led by Standard General, the company's largest shareholder. (AC ¶¶ 36, 37)

Standard General had "standing to push things." (AC ¶ 37) According to the Trust, this was due in part to the relationship between Magnacca and Kim. (AC ¶ 39) Magnacca and Kim communicated frequently by text message. In those messages, Magnacca assured Kim that, "I'm there for you" and that "I'm all in with you. Let me know what you need. I'll be anyplace anytime." (*Id.*)

According to the Trust, Kim reciprocated Magnacca's loyalty. He caused Standard General to appoint Magnacca to the board of directors of American Apparel, a struggling company in which Standard General had a substantial interest. (AC ¶ 40) Kim advised Magnacca that it was an "important time for [Magnacca] to begin to establish [himself] beyond [RadioShack]" because given what was happening at RadioShack "having something else going on might be healthy." (*Id.*)

The board of RadioShack approved Magnacca's request to serve on American Apparel's board. (AC ¶ 43) And, knowing that Magnacca served in that capacity, it nevertheless advised Kim to work directly with Magnacca to negotiate the recapitalization. (*Id.*)

Even though RadioShack's financial condition was fragile, Kim opposed a bankruptcy alternative. (AC ¶ 48) To him, bankruptcy was "a dead-end road" that would lead to RadioShack's total liquidation. (*Id.*) Instead, Kim proposed that Standard General purchase a participation in the G.E. Capital Loan. (AC ¶ 49) The new participation would provide temporary liquidity by freeing up discretionary borrowing base reserves that were hamstringing the company. (*Id.*)

RadioShack's management and advisors worked to assess whether this proposal was viable. (AC ¶ 51) Standard General first presented its recapitalization plan to the board on August 28, 2014. (AC ¶ 57) As discussions progressed, Standard General and Magnacca allegedly marginalized or worked around company advisors who wanted the company to explore other turnaround opportunities. (AC ¶¶ 58-60)

Standard General's plan to purchase a participation interest in the G.E. Capital Loan failed to materialize because G.E. Capital refused to sell an interest to Standard General. (AC ¶ 62) So, Standard General changed its strategy to acquire the entire G.E. Capital Loan. (AC ¶ 63) Under this plan, Standard General and certain hedge funds would convert the original $535 million asset-based revolver into separate components: a term loan of $275 million; a $120 million letter of credit; and new revolving loans up to $140 million. (*Id.*) The existing $50 million asset-based term loan would remain intact. (*Id.*) Standard General and the hedge fund lenders would also agree to forbear from imposing discretionary borrowing base reserves until March 15, 2015. (*Id.*) This would allow RadioShack to purchase inventory for the 2014 holiday season, although, in fact, that never happened. (*Id.*)

A critical component of Standard General's plan was the "Recapitalization and Investment Agreement." (AC ¶ 64) Under that agreement, Standard General would be entitled to convert

funded obligations of $120 million into a majority interest in RadioShack of between 50 to 80 percent of the company's stock.  (*Id.*)

The amended credit agreement would replace discretionary borrowing base reserves with additional events of default if certain steps did not occur before March 16, 2015.  (AC ¶ 65)  Those steps included: giving Standard General the right to nominate four people to RadioShack's seven-member board; amending or replacing RadioShack's contract with Sprint; completing a rights offering for new preferred shares in RadioShack; and the company having a minimum liquidity of $100 million in January 2015.  (*Id.*)

At a two-hour board meeting on October 2, 2014, all of the independent directors approved the Standard General proposal.  (AC ¶85)  However, Magnacca did not participate in the vote. (Trust Br. at n. 7, p. 24)  The transaction became effective immediately.  (AC ¶ 85)

Unfortunately, the transaction with Standard General (which I refer to herein as the "Transaction") did nothing to reverse RadioShack's insolvency.  (AC ¶ 97)  On February 2, 2015, the New York Stock Exchange delisted RadioShack's common stock.  (AC ¶ 98)  Three days later, RadioShack filed for bankruptcy.  (*Id.*)

### III.  Procedural Background

The unsecured creditors' committee of RadioShack filed this lawsuit in the United States District Court for this district and division on August 31, 2015.  Immediately thereafter, the District Court referred the lawsuit to me.

When it was commenced, the lawsuit also named Kim, Standard General and Wells Fargo Bank as defendants.  Those claims have been settled.  (AC ¶ 12)  On October 29, 2015, the Trust filed its Amended Complaint,[1] wherein, among other things, it substituted itself as plaintiff.  The

---

[1] For the sake of expediency, I refer to the Amended Complaint as the "complaint."

defendants have moved to dismiss the complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

The defendants have agreed that I may enter a final judgment in this case. The Trust has not yet agreed to trial in my court or the entry of a final judgment by me. But, it does agree that I may enter a final order on this dispositive motion.[2]

## IV. The Complaint

In count one, the Trust alleges that all defendants breached their fiduciary duties by abdicating their responsibilities as directors. It alleges that, even though RadioShack was undergoing a change of control, the directors made no attempt to survey available alternatives or seek out the best price for the company, steps they should have taken under the Delaware Supreme Court's ruling in *Revlon v. McAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). Next, it alleges that even though they knew that Magnacca was conflicted by his relationship with Standard General, the directors nevertheless permitted him to act as chief negotiator on behalf of RadioShack. And, despite knowing that Magnacca was pushing aside and undermining other professionals hired by RadioShack, the directors yielded their responsibilities to him and followed him down the only path he would permit the company to pursue. That path led to the Transaction, a refinancing that the directors not only knew would not solve RadioShack's liquidity problem, but which was, in fact, reverse-engineered by Standard General to ensure RadioShack's failure and Standard General's control of the company when that failure occurred.

---

[2] Stated differently, the Trust agrees that I need not submit proposed findings and conclusions to the District Court pursuant to 28 U.S.C. § 157(c)(1). This consent is sanctioned by *Wellness Int'l. Net. Ltd. v. Sharif*, 135 S.Ct. 1932 (2015).

In count two, the Trust alleges that Magnacca breached his fiduciary duty as an officer of RadioShack. Relying on essentially the same facts as in count one, the Trust contends that as chief negotiator of the Transaction, Magnacca acted under a conflict of interest and allowed RadioShack to enter into a transaction that he knew favored Standard General and operated to the detriment of RadioShack.

In count three, the Trust alleges that the directors received a fraudulent transfer. Under the Recapitalization and Investment Agreement, RadioShack purported to release the directors from any claims related to the Transaction. The Trust alleges that the release was constructively fraudulent because RadioShack received no consideration for the release. It also alleges that the release was procured by actual fraud because the directors bargained for the release with the intent to hinder, delay and defraud creditors. The Trust does not seek damages against the directors in count three, but requests that the release be avoided.

## V. The Motion To Dismiss

In their motion to dismiss count one, the defendants contend that: the Transaction is not a *Revlon* transaction, thus negating the application of enhanced judicial scrutiny; the directors are protected by the business judgment rule; the complaint does not allege facts supporting a claim for breach of the duty of loyalty or its subsidiary duty of good faith, thus negating an entire fairness review; and any claims for breach of the duty of care are fully exculpated.

Magnacca moves to dismiss count two because even though it is directed at his actions as an officer, it fails to allege facts that distinguish his actions as an officer from those where he acted as a director.

All defendants move to dismiss count three as moot because inasmuch as they have no liability under count one, they have no need to rely on the release provision.

## VI.  Standard for Motions To Dismiss

The defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), which applies to this adversary proceeding pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure.  To survive the motion, the complaint must contain sufficient factual allegations, which, if accepted as true, state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  When considering a motion to dismiss, I accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff.  *Vanderbrook v. Unitrin Preferred Ins. Co. (In re Katrina Canal Breaches Litig.)*, 495 F.3d 191, 205 (5th Cir. 2007).  But I do not accept conclusory allegations or legal conclusions as true.  *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).

## VII.  Analysis

### A.  Duties, Presumptions and Burdens Under Delaware Law

Because RadioShack is a Delaware corporation, Delaware law governs the duties of the directors with respect to the Transaction.  Under Delaware law, directors owe two fiduciary duties – care and loyalty.  *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).  But, directors of Delaware corporations enjoy the protections of the business judgment rule.  As such, they are presumed to have "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).  So strong is this presumption that its application is often outcome determinative.  *Mills*, 559 A.2d at 1279.

A plaintiff who alleges that directors have breached their fiduciary duties can overcome the business of judgment rule in one of two ways.  First, it can allege facts showing that the transaction is one as to which the business judgment rule does not apply in the first place.  Or, it

can allege facts that overcome the very presumptions that underlie the rule. Here, the Trust purports to do both.

First, the Trust contends that the business judgment rule does not apply because the Transaction is governed by the Delaware Supreme Court's ruling in *Revlon*, which requires that in a sale of control transaction, the directors must act "reasonably to seek the transaction offering the best value reasonably available to the stockholders." *Paramount Comm., Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del. 1994). If *Revlon* applies, a court must apply enhanced scrutiny to ensure that the directors acted reasonably. *Id.* at 45. Once enhanced judicial scrutiny is applied, it is the directors who have the burden of establishing the reasonableness of their actions. *Unitrin, Inc. v. American General Corp.*, 651 A.2d 1361, 1374 (Del. 1994).

The negation of the business judgment rule by a well-pleaded *Revlon* claim is not necessarily dispositive when it comes to duty-of-care claims. If the company's charter has an exculpation provision as permitted by Delaware law,[3] the directors are shielded from liability for a breach of their duty of care. *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 239 (Del. 2009). RadioShack's charter has such a provision. So, even if *Revlon* applies, it is not sufficient as an initial matter for the Trust to plead only duty-of-care claims. Instead, it must plead facts demonstrating that the directors breached their duty of loyalty. That is because loyalty breaches are not subject to exculpation. *Id.* Here, the Trust alleges that the directors breached their duty of loyalty by abdicating their responsibilities when they approved the Transaction.

But, the Trust does not rely exclusively on *Revlon*. It also argues that even if *Revlon* does not apply, it has pleaded facts that demonstrate that the directors breached their duty of good faith

---

[3] 8 Del. C. § 102(b)(7).

in approving the Transaction. The duty of good faith is a subsidiary of the duty of loyalty. *Stone ex. rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

A failure to act in good faith may be shown where "a fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation" or "intentionally fails to act in the face of a known duty to act." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64-67 (Del. 2006). But in the transactional context, "[an] extreme set of facts is required to sustain a disloyalty claim . . . ." *Lyondell*, 970 A.2d at 243.[4]

If the Trust alleges facts that state a claim for a breach of the duty of loyalty, then the Transaction is reviewed under the entire fairness standard. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1164 (Del. 1995). And, once that standard is triggered, even duty-of-care claims cannot be dismissed at the pleadings stage as long as the facts supporting those claims are intertwined with duty-of-loyalty claims. *Bridgeport Holdings Inc. Litig. Tr. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 565 (Bankr. D. Del. 2008); *Aldina v. Internet.com Corp.*, 2002 Del. Ch. Lexis 156 (Del. Ch., Nov. 8, 2002).

### B. The Directors Did Not Breach Their Duty of Loyalty

### 1. The Trust Has Standing To Pursue Claims on Behalf of Creditors

In *Lyondell Chemical Company v. Ryan*, the Delaware Supreme Court held that there is only one *Revlon* duty – "to '[get] the best price for the stockholders at a sale of the company.'" 970 A.2d at 242 quoting *Revlon*, 506 A.2d at 182. This articulation of the *Revlon* duty presents two initial problems for the Trust, the first of which is easily disposed of. *Revlon* and *Lyondell* speak in terms of procuring the best price for the benefit of *stockholders*. But here, the primary beneficiaries of this suit are RadioShack's creditors. The Delaware Supreme Court has laid to rest

---

[4] This standard applies even when *Revlon* is implicated. *Lyondell*, 970 A.2d at 243.

any doubt about this issue. It has held that when a company is insolvent, *Revlon's* protection extends to the company itself, thus making creditors its primary beneficiaries. *N. Am. Catholic Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). The Trust alleges that RadioShack was insolvent at all relevant times. So, if *Revlon* applies, it is of no moment that no recovery may reach stockholders.

### 2. Even Though the Transaction Contemplated the Possibility of a Merger, *Revlon* Scrutiny Is Not Automatically Mandated

The second hurdle presented by *Lyondell's* articulation of *Revlon's* "one" duty is not so easily surpassed. Because *Lyondell* explains that Revlon's one duty is to get the best price "*at a sale of the company*," the defendants argue that *Revlon* only applies when the company is sold. The Trust disagrees. As it notes, *Lyondell* itself says that the duty applies "when a company embarks on a transaction . . . that will result in a change of control." *Lyondell*, 970 A.2d at 242.

The Trust is correct that *Revlon* has been applied outside the confines of traditional sales. For example, the Delaware Supreme Court has applied *Revlon* not just to stock sales, but to mergers as well. *See, e.g.*, *QVC*, 637 A.2d at 34-39; *Lyondell*, 970 A.2d at 235; *C & J Energy Services, Inc. v. Miami Gen'l. Employees' and Sanitation Employees' Ret. Tr.*, 107 A.3d 1049 (Del. 2014).

Here, the Transaction did at least contemplate the possibility of a merger. (RadioShack Form 8-K, October 3, 2014 at 5 ("Under the Recapitalization Agreement, the Company is obligated to enter into a merger agreement with a newly formed, wholly owned subsidiary of the company and seek stockholder approval of the merger promptly after the consummation of the Rights Offering."))[5]

---

[5] The defendants introduced into the record certain S.E.C. documents relating to the Transaction. (*see* Aff. of A. Perez, dkt. # 20).

So, does the fact that the Transaction contemplated the possibility of a merger between RadioShack and a newly-formed, wholly-owned subsidiary automatically require me to apply *Revlon* scrutiny? I do not think so. "It is too often forgotten that *Revlon*, and later cases like *QVC*, primarily involved board resistance to a competing bid after the board had agreed to a change of control, which threatened to impede the emergence of another higher-priced deal." *C & J Energy*, 107 A.3d at 1053. Indeed, *Revlon's* concern was that "when a board implements anti-takeover measures there arises 'the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation . . . .'" *Revlon*, 506 A.2d at 180, quoting *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985).

While I acknowledge that *Revlon* scrutiny can apply to mergers, I consider it lazy jurisprudence to focus on the mere possibility that a merger might have occurred and permit that to be the tail that wags the dog when it comes to applying *Revlon* scrutiny. Instead, I must examine the "specific circumstances" of the Transaction to see if it is the type of transaction that raises the concerns that *Revlon* was intended to address. *Paramount v. QVC*, 637 A.2d at 46.

I find few such concerns in this case. First, there is no allegation that any director other than Magnacca was acting in his or her own interest. Indeed, there is no suggestion as to why any disinterested director was motivated to elevate Magnacca's self-interest over the best interest of the company. Yet, Delaware law is clear that "each director has a right to be considered individually when [he faces] claims for damages in a suit challenging board action." *In re Cornerstone Therapeutics Inc.*, 115 A.3d 1173, 1182 (Del. 2015). That "individualized consideration does not start with the assumption that each director was disloyal." *Id.*

14

### 3.  Standard General's Right To Foreclose Under the Amended Credit Agreement Did Not Constitute a Change of Control Under *Revlon*

Next, I examine how the change of control was to be effectuated in this case.  After all, *Revlon* only applies when a company embarks on a transaction that "*will result* in a change of control."  *Lyondell*, 970 A.2d at 242 (emphasis supplied).   According to the Trust, the "cornerstone" of Standard General's scheme was acquiring control of RadioShack's senior debt. (AC ¶ 4)  By doing so, Standard General "could capture the potential turnaround value for itself through a foreclosure in bankruptcy at a fire sale price." *(Id.)*

The notion that capturing control of a corporation via foreclosure constitutes a change of control under *Revlon* is novel.  I know of no authority for such a position.  But, more troubling than any lack of precedent is the fact that the right to foreclose in the event of default is a right that exists in every secured transaction.  If *Revlon* can be extended to secured transactions because "control" can be transferred via foreclosure, then the presumptions of the business judgment rule would be eliminated from so many routine transactions that the exceptions would swallow the rule itself.

Moreover, the basis to apply *Revlon* to the secured financing here is even more attenuated. After all, the Transaction substituted Standard General as the lender under an existing loan facility with G.E. Capital.  If the "control" sought by Standard General was the control it could exercise by right of foreclosure, then it is the exact same type of control exercised by G.E. Capital.  So, arguably, no "change" of control occurred because that right already existed.

But, according to the Trust, the Standard General facility was more insidious than the G.E. Capital facility because it amended the credit agreement to replace discretionary borrowing base reserves with new events of default.  (AC ¶ 65)  Under those amendments, if certain steps that

would "realize Standard General's change in control" did not occur by March 16, 2015, any such failure would be considered to be an event of default. (*Id.*)

Setting aside temporarily the question of whether foreclosure can ever be the type of change of control envisioned by *Revlon*, the suggestion that these changes to the credit agreement were more likely to lead to foreclosure than the borrowing base reserves is belied by the complaint itself. After all, the reserves were part of a package that "presaged the company's collapse." (AC ¶ 29) They permitted G.E. Capital to require RadioShack to set aside collateral to provide G.E. Capital with comfort that RadioShack could cover its obligations. (*Id.*) That in turn not only restricted RadioShack's ability to use those earmarked amounts, but removed those assets from its borrowing base, thus limiting its access to revolving loans. (*Id.*) All of this exacerbated RadioShack's liquidity problem. (*Id.*) Indeed, so dire was the company's condition that only months after completing the G.E. Capital transaction, RadioShack was scrambling to revise its business plan. (AC ¶ 31)

If the Trust is suggesting that the amended credit agreement with Standard General was more likely to lead to foreclosure than the credit agreement with G.E. Capital, then any such allegation is speculative at best. I need not accept it as true. So, while I resist the notion that a secured transaction can be a change-of-control transaction in the first place, I fail to see how the alleged change-of-control aspects of the amended credit agreement effected a change of control here.

### 4. The Possibility That a Portion of Standard General's Debt Might Be Converted to Equity Does Not Mandate *Revlon* Scrutiny

The Transaction did have one feature that is not common to most secured financings. The parties agreed that under certain conditions Standard General could convert funded obligations of $120 million into a new series of RadioShack preferred stock. (AC ¶ 76) The effect of this

conversion would be to permit Standard General to own 50% to 80% of the equity of the company. (AC ¶¶ 4, 86)  According to the Trust, this conversion feature mandates *Revlon* review.

It is true that lower courts in Delaware have employed a *Revlon* analysis in the context of loan transactions where part of the consideration was convertible notes or warrants.  *Binks v. DSL.net, Inc.*, 2010 Del. Ch. Lexis 98 (Del. Ch., April 29, 2010); *Equity-Linked Investors, L.P. v. Adams*, 705 A.2d 1040 (Del. Ch. 1997).  However, in both of those cases the courts assumed, without deciding, that *Revlon* applied.  *Binks*, 2010 Del. Ch. Lexis 98 at * 24; *Equity-Linked*, 705 A.2d at 1055.  In neither case was the application of *Revlon* outcome determinative because the courts ruled for the defendants even under the enhanced judicial scrutiny standard.

Applying *Revlon* here could be outcome-determinative.  In the context of a motion to dismiss, shifting the burden to demonstrate reasonableness to the directors is significant.  Because the directors must rely solely on allegations that tend to cast their actions in the dimmest light, it is challenging for them to meet this initial burden.  So, I cannot simply assume that *Revlon* applies and leave the issue for another day.  I must decide whether the conversion feature gives rise to *Revlon* review.  I conclude that it does not.

First, in order for the conversion right to be operative, RadioShack had to have $100 million in liquidity on January 15, 2015 and successfully renegotiate its contract with wireless supplier Sprint.  (AC ¶ 76)  The conditions to the conversion of debt to equity belie the notion that the Transaction implicates *Revlon* scrutiny.  The Delaware Supreme Court has held that *Revlon's* one duty does not arise simply because a company is "in play."  *Lyondell*, 970 A.2d at 242.  Instead, it arises when a company embarks on a transaction that "will result" in a change of control.  *Id.*; *see also Arnold v. Soc'y for Savings Bancorp, Inc.*, 650 A.2d 1270, 1290 (Del. 1994) (holding that

there is no change in control when control "remains in a large, fluid, changeable and changing market"). Here it was not certain that a conversion of debt to equity would ever occur.

But, there's more. As if these patently conditional aspects of the transaction were not enough, the Trust alleges that the conditions to conversion (for example, the liquidity condition) would never be met. (AC ¶ 77) Indeed, the Trust alleges that the business forecasts underlying the assumptions for conversion were "fanciful." (AC ¶ 90) Moreover, according to the Trust, the directors knew that these conditions would never be met. (AC ¶¶ 76, 77) For his part, Magnacca knew the "contingencies . . . were impossible to achieve." (AC ¶ 110) The direct (or at least reasonable) inference to be drawn from these allegations is that in approving the Transaction, the directors knew they were approving nothing more than a secured financing which, as I have noted, should not mandate *Revlon* scrutiny.[6]

### 5. The Possibility That Standard General Might Control the Board Did Not Signal a Change of Control

A third alleged change-of-control feature in the Transaction was the provision under the Recapitalization and Investment Agreement that RadioShack's board would be reconstituted to give Standard General control of RadioShack's board. (AC ¶ 65) But, again, this reconstitution was conditioned upon the debt-to-equity conversion, an event that might never happen and that the Trust alleges never would.[7]

---

[6] Another feature of the Transaction that allegedly signaled a change of control was its requirement that RadioShack establish a six-person "Transaction Committee" consisting of three members designated by a Standard General affiliate. (AC ¶ 64) This committee was entrusted with overseeing and coordinating discussions regarding recapitalization transactions and the implementation of an interim operating plan for RadioShack. (*Id.*) But, I fail to see how "coordinating discussions" is an exercise of control. Likewise, I fail to see how implementing an interim operating plan is the type of activity that *Revlon* was intended to address.

[7] If the conversion occurred, the newly constituted board would consist of RadioShack's CEO, two independent directors reasonably satisfactory to RadioShack and Standard General, and four

### 6. The Cumulative Elements of the Transaction
### Did Not Presage a Change of Control

As the foregoing analysis reveals, each element of control to be exercised by Standard General as part of the Transaction was either not subject to *Revlon* review to begin with (the right to foreclose), or was so conditional that it might never occur (the debt-to-equity conversion and board control).

But, the Trust argues that I must consider the cumulative effect of these features. The argument is that one way or the other Standard General would end up owning or controlling RadioShack. It attempts to bolster this argument by noting that shortly after RadioShack filed for bankruptcy, Standard General finalized its scheme by credit bidding its debt for the company's most profitable stores, thereby executing the foreclosure it planned all along. (AC ¶ 100)

It is tempting to adopt this holistic approach to change of control and simply move on to scrutinizing the transaction under *Revlon*. But, I cannot do so. According to the Trust, gaining control of RadioShack through its secured debt was the "cornerstone" of Standard General's plan. (AC ¶ 4) Because both Standard General and the directors allegedly knew that the conversion of debt to equity would never occur (AC ¶¶ 76, 77), that aspect of the transaction was merely ancillary to the secured financing. And, as I have previously noted, I know of no authority or sound policy that would cause me to extend *Revlon* to financing transactions in general or this one in particular.

Finally, if it is appropriate to employ hindsight to determine if, in fact, a particular transaction was a change-of-control transaction, then hindsight tells us that the conversion feature

---

people nominated by Standard General, but at least two of whom were required to satisfy NYSE listing requirements for director independence. (RadioShack Form-3 Registration Statement, Dec. 12, 2014 at p. 2) Because the transaction essentially called for the appointment of four independent directors (even assuming Magnacca was not independent), reasonable minds can differ on whether Standard General would "control" the board.

of the Transaction had nothing to do with RadioShack's failure.  If RadioShack's failure can be ascribed in whole or part to the Transaction, it is because it failed as a financing, not as an equity play.  (See AC ¶¶ 77-79)  Indeed, the Trust agrees.  Not one of the benchmarks that would have brought about a conversion of debt to equity ever occurred.

### 7.  The Duties Proffered By the Trust Are Not *Revlon* Duties

Next, the very nature of the duties sought to be imposed by the Trust causes me to question whether these are *Revlon* claims.  As I have noted, *Revlon's* one duty is to get the best price at a sale of the company.  *Lyondell*, 970 A.2d at 242.  But, because the Transaction does not neatly fit the paradigm of a sale, the Trust asks me to extrapolate other duties from *Revlon*.  These include the duty to maximize the "immediate value" of the company by aggressively auctioning the company to the highest and best bidder (AC ¶¶ 2, 4, 11, 91) or the duty to stop, file for bankruptcy and liquidate the company (AC ¶¶ 11, 93, 94).

It is edifying to articulate these proffered duties as affirmative duties in the context of the facts of this case.  According to the Trust, when a company enters into a secured financing that could result in foreclosure or converting debt to enough equity to give the lender a majority ownership in the company, then the board must aggressively auction the company to maximize immediate value or file for bankruptcy and liquidate.

As an initial matter, the proffered duties do not logically flow from the transaction itself. The assertion that embarking on a secured financing that might transfer equity control to the lender compels the board to put the company up for auction or file for bankruptcy is flawed logic.  This is so even if the company is in dire financial straits.

Moreover, the duties proffered by the Trust are not *Revlon* duties in any event.  Even in the context of a classic sale of a company's stock, a board is not required to conduct an active auction

of the company's stock. *Lyondell*, 970 A.2d at 242. If this is so, how does such a duty arise in the context of a secured financing with conversion rights?

The Trust's alternative assertion that the board should have placed the company in bankruptcy in order to preserve the "immediate value" of the company is a permutation of the argument that a board has a duty to avoid deepening a company's insolvency. But, no such cause of action exists under Delaware law. *Trenwick Am. Litig. Tr. v. Ernst & Young*, 906 A.2d 168, 175 (Del. Ch. 2006), *aff'd sub. nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).

In summary, the Transaction is not a *Revlon*-type transaction. The duties the Trust would have me ascribe to the Transaction are not *Revlon* duties. I can only conclude that *Revlon* does not apply.

### C. The Complaint Does Not Allege Facts That Rebut the Business Judgment Rule

#### 1. The Transaction Can Be Explained On Grounds Other Than Bad Faith

If *Revlon* does not apply, then the Transaction is not subject to enhanced judicial scrutiny. So, to survive a motion to dismiss, the Trust must allege well-pleaded facts to overcome the business judgment rule. That is, it must allege facts that belie the presumption that the directors acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company. *Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243, 1246 (Del. 1996). That presumption may be rebutted only in "rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'" *Id.* quoting *In re J. P. Stevens & Co.*, 542 A.2d 770, 780-81 (Del. Ch. 1988). "The decision must be 'egregious,' 'lack any rational business purpose,'[8] constitute a

---

[8] "Rationality" is a lower standard of review than "reasonableness." *In re Toys "R" Us, Inc.*, 877 A.2d 975, 1000 (Del. Ch. 2005).

'gross abuse of discretion,' or be 'so thoroughly defective that it carries a 'badge of fraud.'" *Aldina v. Internet.com Corp.,* 2002 Del. Ch. Lexis 156, * 13 (Del. Ch., Nov. 8, 2002) (citation omitted). The Trust argues that this is such a case. I disagree.

The Trust points to *Parnes v. Bally* as authority for its position. In *Parnes,* the plaintiff, a shareholder of Bally, challenged the fairness of the process pursuant to which Bally was merged into Hilton, as well as the price that the merger produced. 722 A.2d at 1245. According to the plaintiff, as a condition to his support for the merger, Bally's chairman and chief executive officer, Arthur Goldberg, demanded that he personally receive millions of dollars in cash and other assets. *Id.* at 1246. Parnes alleged that other interested acquirers would have paid more for Bally, but were discouraged from doing so due to Goldberg's illegal demands. *Id.* The chancery court characterized Goldberg's demands as egregious. The Delaware Supreme Court called them a bribe.

Here, according to the Trust, Standard General arranged for Magnacca to be appointed to the board of American Apparel, an affiliate of Standard General. Magnacca's appointment to the board of American Apparel was a "possible relationship build" with Standard General and a chance to establish himself beyond RadioShack. (AC ¶ 40) RadioShack's board not only was aware of Magnacca's appointment to the American Apparel board, it approved it. And, notwithstanding the relationship between Kim and Magnacca, the board made him the point man in the negotiations leading up to the Transaction.

In contrast to Goldberg, who allegedly engineered the sale of Bally for less money so that he personally could receive millions in compensation from Hilton, Magnacca received from Kim the appointment to the American Apparel board and "the promise of future opportunities" with Standard General. (AC ¶ 5) But normally the mere "hope of better employment opportunities" is

not the type of interest that calls into question one's loyalty. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1170 (Del. 1995).

In *Parnes*, Bally allegedly was sold for less money because other suitors refused to match the bribes Hilton agreed to pay to Goldberg. It is easy to characterize Goldberg's actions and the board's acquiescence to them as transgressions of bad faith. But, here, the decision to refinance rather than liquidate is not a choice that can only be explained on the grounds of bad faith. "Even when a firm is insolvent, its directors may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red." *Trenwick*, 906 A.2d at 174.

Moreover, the complaint itself alleges facts that support the decision to approve the Transaction. Those include: improving the liquidity of the company; eliminating borrowing base reserves that were "hamstringing" the company; and bridging RadioShack from its immediate cash crunch in October 2014 through the Christmas season when its financial condition hopefully would improve. These facts belie the notion that the Transaction had no rational business purpose.[9]

## 2. The Trust's Bad Faith Claims Strain Credulity

The Trust complains that Magnacca gave special deference to Standard General. It alleges that he and Standard General worked around RadioShack's other advisors, that he gave Standard General "unprecedented access" to RadioShack, and that he refused to consider or develop

---

[9] The facts of this case are also significantly different from those in *Aldina v. Internet.com*, 2002 Del. Ch. Lexis 156. In *Aldina*, the plaintiff alleged that the CEO of the acquired company in a merger negotiated for himself a majority ownership of a valuable subsidiary of the acquired company. The plaintiffs alleged that the CEO received the shares at a grossly unfair price in exchange for his recommendation and approval of the transaction. *Id.* at * 18. This in turn may have led to the diversion of company funds to the CEO and the shareholders receiving a grossly unfair price for their shares. *Id.* Again, if true, these allegations are difficult to explain on any grounds other than bad faith. But, they are a far cry from the allegations in this case.

alternatives to Standard General's plan. These allegations might appear less sinister if Magnacca had not built a close relationship with Kim. But, even viewed in the light of that relationship and accepting the allegations as true, it is difficult to make the leap that the Trust would have me take. Fairly construed, the complaint alleges that Magnacca led the board to approve the Transaction knowing that it would lead to Standard General foreclosing on RadioShack's most valuable assets. The Trust suggests this was a price Magnacca was willing to pay in return for a directorship on another failing company[10] and the vague promise of a soft landing with Standard General. By itself, that is a bold claim.

But, the boldness does not end there. The Trust alleges that the independent and disinterested directors not only were aware of Magnacca's conflict, but that they knew that the Transaction would never bring about a conversion of debt to equity. (AC ¶¶ 76, 77) So, shockingly, they allegedly knew Magnacca was self-dealing, and that the Transaction would lead to foreclosure. And, yet, the Trust never purports to explain why the independent directors would knowingly sacrifice RadioShack to foreclosure. And, given that they had nothing to gain from foreclosure, the Trust should at least try to explain their motivations. *See Miramar Firefighters Pension Fund v. Abovenet, Inc.*, 2013 Del. Ch. Lexis 200 at * 22, n. 58 (Del. Ch., July 31, 2013); *In re BJ's Wholesale Club, Inc.*, 2013 Del. Ch. Lexis 28 at * 10 (Del. Ch., Jan. 31, 2013). The fact that the Trust does not – or perhaps, cannot – explain why the independent directors would willingly surrender RadioShack to such a fate suggests a fatal flaw in count one: the allegations against the independent directors are speculative and conclusory and, as such, are entitled to no weight in the context of a motion to dismiss.

---

[10] American Apparel filed its own bankruptcy case in 2015.

We now know that the Transaction did not save RadioShack. In hindsight, we might say that the directors could have done more. But, if the directors failed to do all that they should have done, they breached their duty of care, not their duty of loyalty. *Lyondell*, 970 A.2d at 242. And, they are exculpated from liability for any breach of the duty of care.

In sum, Magnacca's and the board's actions were not egregious. The terms of the Transaction were not so outrageous that they can only be explained as being the product of bad faith. The complaint fails to state a claim for breach of loyalty as to Magnacca and the independent directors. Count one must be dismissed.

### D. The Complaint States a Claim Against Magnacca as an Officer of RadioShack

In count two the Trust alleges that Magnacca breached his fiduciary duty as an officer of RadioShack. Magnacca moves to dismiss this claim on one ground – that the Trust has failed to plead facts showing that he acted solely in his capacity as an officer when he negotiated and recommended approval of the Transaction.

In *Arnold v. Soc'y for Sav. Bancorp*, the Delaware Supreme Court held that when a defendant is sued as both an officer and a director, the petition must specify actions taken by a defendant in his capacity as an officer "as distinct from his actions as a director." 650 A.2d 1270, 1288 (Del. 1994) But, more recently, it held that the same facts that make it reasonable to infer that a defendant violated his duty as a director can establish the violation of the same duty as an officer. *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009). It may be possible to reconcile *Arnold* and *Gantler*[11] but I do not attempt to do so here. That is because the complaint states a

---

[11] The two decisions may be explained by the fact that prior to *Gantler* the Delaware Supreme Court had not explicitly held that the duties owed by officers are identical to those owed by directors. *Gantler*, 965 A.2d at 709.

claim that Magnacca breached his duty of care in his capacity as an officer in any event.   The

board delegated to Magnacca the responsibility of negotiating the Transaction with Kim.   It is not

clear whether in doing so Magnacca acted in his capacity as CEO or director.   *See In re Plains*

*Expl. & Prod. Co.*, 2013 Del. Ch. Lexis 118 at * 18 (Del. Ch., May 9, 2013) ("Delaware law is

clear that in certain circumstances it is appropriate [for the board] to enlist the efforts of

*management* in negotiating a sale of control.") (emphasis supplied).   But, in the context of a motion

to dismiss, reasonable inferences must be drawn in favor of the plaintiff.   It is reasonable to infer

that at least some of Magnacca's actions were taken in his capacity as an officer.

In my ruling on count one, I found that the Trust had not stated a claim against Magnacca

for breach of the duty of loyalty.   Because of the exculpation provision in RadioShack's charter, I

had no need to examine his or the other directors' duty of care.   But, while the exculpation

provision shields *directors* from liability for a breach of their duty of care, it does not shield *officers*

from such liability.   8 Del. C. § 102(b)(7).   So, Magnacca, as an officer, cannot assert exculpation

as a defense to duty-of-care claims.

Magnacca has not moved to dismiss count two on the ground that it fails to state a claim

for breach of the duty of care.   He also has not moved to dismiss it on the basis of the business

judgment rule. [12]   I cannot interpose these defenses on his behalf in his capacity as an officer. [13]

---

[12] The business judgment rule protects officers just as it does directors.   *Cede & Co. Cinerama, Inc. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[13] I also cannot raise a causation defense on his behalf.   Magnacca points to the fact that the Transaction required board approval as proof that he could only have been acting in his capacity as a director.   In doing so, he suggests that because he could not have caused any injury as an officer, he could only have been acting as a director.   But Magnacca does not assert causation itself as a defense to liability.

Because the motion to dismiss count two rests solely on *Arnold*, and I conclude that the Trust has met its pleading burden even if *Arnold* controls, I deny the motion to dismiss count two.

### E.  Count Three Fails To State a Claim
### for Actual or Constructive Fraud

In count three the Trust seeks to avoid a release that RadioShack gave the directors in the Recapitalization and Investment Agreement.  According to the Trust, in section 11.13 of that agreement, RadioShack released the directors from claims relating to the Transaction.  (AC ¶ 113) The Trust seeks to avoid the release under sections 544 and 548 of the Bankruptcy Code as the product of actual or constructive fraud.

The defendants premise their motion to dismiss this claim on the same grounds that support their motion to dismiss count one.  In essence, they argue that because the complaint fails to state a claim as to count one they have no need to rely upon the release, and it is premature for the Trust to foreclose that reliance.  In a footnote in their reply brief they also argue that the Trust has failed to allege facts that state a claim for actual fraud.

I grant the motion to dismiss the actual fraud claim because the Trust has not alleged facts supporting such a claim with particularity as required by Federal Rule of Civil Procedure 9(b).  In light of my ruling on count one, it would be difficult, if not impossible, to allege such facts.  So, I see no need to dismiss with leave to amend.

Also, I will grant the motion to dismiss the constructive fraud claim.  A key element of any such claim is that the defendants received something of value.  11 U.S.C. § 548(a)(1)(B); Tex. Bus. Comm. Code §§ 24.005(a)(2), 24.006(a).  Based upon my conclusion that the directors  did not breach their duty of loyalty and are exculpated against liability for any duty-of-care claim, I

can only conclude that they received nothing of value by way of the release. For these reasons, I dismiss count three.[14]

## VIII.  Conclusion

Judges are naturally and rightly reluctant to dismiss cases at the pleadings stage before meaningful discovery has occurred. This reluctance is due in part to a concern that fuller discovery might lead to a cognizable claim. It is also due to the judge's concern that if he is wrong, injured parties will be denied their day in court. These concerns are only compounded where, as here, thousands have been injured by the collapse of an iconic retailer.

But extraordinary injury does not justify a court setting aside its own judgment as to what is right under the law. Moreover, directors are entitled to the same protections under the law as all other litigants. If the claims against them lack merit, it is of little comfort to them that other injured parties had their day in court. One who has suffered the expense, indignity, and stress of defending his name and reputation in a public forum may find that eventual exoneration is somewhat hollow. That is why judges are not free to defer making hard decisions out of concern that there may be "something more."

It is safe to say that RadioShack's directors did not employ a perfect process in approving the Transaction. But they did not breach their duty of loyalty. The claims against them in count one must be dismissed.

The Trust has stated a claim against Magnacca in his capacity as an officer for breach of the duty of care. The motion to dismiss count two is denied.

---

[14] The Trust does not allege that *officers* were released under section 11.13. So, even though I have not dismissed the duty-of-care claims against Magnacca in his capacity as an officer, I do not construe count three to assert a claim against Magnacca in that capacity.

The directors received no value from the release in the Recapitalization and Investment Agreement.  Count three fails to state a claim for constructive or actual fraud.  It must be dismissed.

* * * END OF MEMORANDUM OPINION * * *